**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
CLARKSBURG**

| | |
|---|---|
| **NANCY LEA NUTT,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO.: 1:19-CV-131**<br>**(JUDGE KEELEY)** |
| **NANCY A. BERRYHILL,**<br>**Acting Commissioner of Social Security,** | |
| **Defendant**. | |

## REPORT AND RECOMMENDATION

### I.   INTRODUCTION

On June 27, 2019, Plaintiff Nancy Lea Nutt ("Plaintiff"), by counsel Susan Kipp McLaughlin, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).   On September 4, 2019, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.   (Answer, ECF No. 9; Admin. R., ECF No. 10). On October 25, 2019, and November 25, 2019, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment.   (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 18; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 16).   Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.   <u>PROCEDURAL HISTORY</u>

On April 6, 2015, Plaintiff protectively filed her first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on January 1, 2010. (R. 15).  Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2014 for her Title II disability benefits; therefore, Plaintiff must establish disability on or before this date. (R. 45).  This claim was initially denied on September 1, 2015 (R. 15) and denied again upon reconsideration on February 4, 2016. (R. 15).  On April 4, 2016, Plaintiff filed a written request for a hearing (R. 15), which was held before United States Administrative Law Judge ("ALJ") Jeffrey P. La Vicka on January 18, 2018 in Morgantown, West Virginia. (R. 45).  Plaintiff, represented by Rule 10 certified student attorney Alex Herman,[1] appeared and testified. Due to time constraints, the hearing was continued until May 17, 2018. R. at 87. Plaintiff was represented by counsel, Molly Russel, Esq., and Larry Bell, an impartial vocational expert, also testified. <u>Id.</u> at 88. On May 30, 2018, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 15-28). On April 25, 2019, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1-7).

## III.   <u>BACKGROUND</u>

### A.   **Personal History**

Plaintiff was born on January 21, 1963, and was fifty two years old at the time she filed her first SSI claim. (R. 49). She completed high school (R. 55-56) and approximately two years of

---

[1] Mr. Herman was accompanied by another Rule 10 certified student attorney, Colin Henning, and their Supervisor Susan McLaughlin. R. at 46.

college. Id. Plaintiff's prior work experience included a counselor at R.E.M.; an auto-parts delivery clerk; and a hostess for Bob Evans. (R. 64-66). She was single at the time she filed her initial claim (R. 50) and was single at the time of the administrative hearing. (R. 50). She has two children, but no dependent children. (R. 50). Plaintiff alleges disability based on sprains and strains; major depressive disorder; anxiety; bipolar disorder; post-traumatic stress disorder; attention deficit hyperactive disorder/ADHD secondary to history of traumatic brain injury; cognitive disorder/neurocognitive disorder; mood disorder; and opioid dependence depression. Plf. Br. at 2.

**B.    Medical History**

    **1.   Medical History Pre-Dating Alleged Onset Date of January 1, 2010**

There is no medical evidence present in the record regarding Plaintiff's medical history prior to the alleged date of onset of injury.

    **2.   Medical History Post-Dating Alleged Onset Date of January 1, 2010**

On April 7, 2010, Plaintiff visited Dr. Berry noted that Plaintiff was sober for three months and attend three "meetings"[2] in the previous two weeks. Id. at 455. Plaintiff reported that she was doing well and intends to attend more meetings. Id. Dr. Berry continued Plaintiff's suboxone treatment and her previously prescribed medications. Id.

On May 5, 2010, Plaintiff visited Dr. Berry for a follow up for medication management, addiction education, and evaluation of progress in recovery. Id. at 459. Dr. Berry noted that Plaintiff was sober for four months. Plaintiff stated that she has been doing well and is looking for an employment program. Plaintiff noted that she is speaking to someone who she would like to be

---

[2] Plaintiff is an addict with both alcohol and narcotic substance abuse issues. Plaintiff has been sober from all substances throughout the relevant times. Plaintiff has different dates in which she obtained sobriety from alcohol and narcotics. This will account for the different references throughout the record when describing how long Plaintiff has maintained her sobriety.

her sponsor, but still continues to struggle being around people. Id. Plaintiff noted that she has some cravings, but no side effects and withdrawal symptoms. Id.

On June 2, 2010, Plaintiff visited WVU Healthcare for a follow up. Id. at 461. Plaintiff saw Martha Ferris, a licensed social worker, who described Plaintiff's appearance as agitated, but she seemed to calm towards the end of the session. Id. Plaintiff noted that her unemployment hearing was "unsettling" and Plaintiff is "beating herself up" for not rebutting vigorously. Id. Plaintiff stated that she wondered "if she will feel better and be 'productive in the world.'" Id.

On July 7, 2010, Plaintiff visited Dr. Berry for a suboxone clinic follow-up. Plaintiff was seen for medication management, addiction education, and evaluation of progress. Id. at 464. Plaintiff noted that she has been sober for approximately 180 days and attended four meetings in the previous week. Id. Plaintiff reported that she was doing well and tolerating the suboxone treatment. Id. Plaintiff stated that she was looking for a new sponsor and working on Steps 5 and 6. Id. Plaintiff noted no cravings, side effects, and withdrawal symptoms. Id.

On August 4, 2010, Plaintiff visited Dr. Berry for a follow up visit. Id. at 467. Plaintiff noted that she was "doing very well." Plaintiff noted that she has no complaints, has a temporary sponsor, and has 187 days of sobriety. Id. at 467. Plaintiff noted no problems with her suboxone treatment and noted no cravings. Plaintiff was ordered to continue his Suboxone treatment, participate in 12-step program, and continue therapy. Id. at 468.

On September 1, 2010, Plaintiff visited Dr. Berry for a medication management, addiction education, and evaluation of progress. Id. at 470. Plaintiff noted that she has been sober for 187 days and attended six to seven meetings since his last doctor's appointment. Id. Plaintiff noted that she is "doing all right," decided not to look for another job, but is taking classes. Id. Plaintiff stated

that she does not go to enough meetings and plans on ordering the NA Step Working Guide. Id. Plaintiff noted that there were no cravings, side effects, or withdrawal symptoms. Id.

On October 6, 2010, Plaintiff visited Dr. Berry for medication management, addiction education, and evaluation of progress. Id. at 473. Plaintiff noted that she has had the flu for the previous one to two weeks and "has not been able to get out as much as she would have liked." Id. Plaintiff noted that she needs to continue to go to more meetings and she is "doing fine" with the Suboxone and denied any problems with medication. Id. Plaintiff noted no cravings, side effects, and withdrawal symptoms. Id.

On November 3, 2010, Plaintiff visited Dr. Berry for medication management, addiction education, and an evaluation of progress. Id. at 476. Plaintiff noted that she has been sober for ten months and attended ten to twelve meetings since the last doctor's appointment. Id. Plaintiff noted that she "is doing well." Plaintiff had no complaints and "[h]as been very active outside," and her annual checkup with her PCP was "good." Id.  Plaintiff noted that she has had no cravings, side effects, or withdrawal symptoms. Id.

On December 1, 2010, Plaintiff visited Dr. Berry for medication management, addiction education, and an evaluation of progress. Id. at 479. Plaintiff reported that she continues to do well, is preparing for the holidays, and her son is a "handful." Plaintiff noted that she wanted to decrease her medication to 10 mg in February. Id. Plaintiff noted no cravings, side effects, or withdrawal symptoms. Id.

On January 5, 2011, Plaintiff visited Dr. Berry for medication management, addiction education, and an evaluation of progress. Id. at 482. Plaintiff noted that she is doing "very well," and is "happy" with her recovery. Id. Plaintiff stated that she has been attending NA meetings

more than AA meetings. Id. Plaintiff noted that she was tolerating suboxone without complaint. Id. Plaintiff noted that she has had no cravings, side effects, and withdrawal symptoms. Id.

On February 2, 2011, Plaintiff visited Dr. Berry for medication management, addiction education, and an evaluation of progress. Id. at 485. Plaintiff noted that she has been sober for over one year. Id. at 485. Plaintiff noted that she continues to do well and expressed interest in lowering her dose of suboxone. Id. Plaintiff noted that she attended four NA meetings in the past month and would like to go to more. Id. Plaintiff noted that she has had no cravings, sides effects, or withdrawal symptoms. Id.

On March 2, 2011, Plaintiff visited Dr. Berry for medication management, addiction education, and an evaluation of progress. Plaintiff was previously seen in the Comprehensive Opioid Addiction Treatment ("COAT") in the Department of Behavioral Medicine and Psychiatry at Chestnut Ride Center. Id. at 488. Plaintiff noted that she had been sober for fifteen months and attended three meetings since her previous doctor's appointment. Id. Plaintiff noted that "has been under a lot of stress this month with a family member in the hospital and hormonal changes." Id. Plaintiff noted that she tried reducing her medication, but only did so for four days. Id. Plaintiff noted that she had no cravings, side effects, or withdrawal symptoms. Id.

On March 30, 2011, Plaintiff visited Dr. Berry for medication management, addiction education, and an evaluation of progress. Id. at 490. Plaintiff noted that she has been sober for one year and two months. Plaintiff attended twelve meetings in the past month. Id. Plaintiff noted that she has not attended a women's AA meeting but is eager to attend. Id. Plaintiff noted that she did not lower her medication but planned to lower her medication. Id. Plaintiff noted that she has had no cravings, side effects, and withdrawal symptoms. Id.

On April 7, 2011, Plaintiff visited Dr. Berry for a follow up visit. Id. at 492. Dr. Berry noted that Plaintiff complained of her ADHD symptoms and a neurospych test was scheduled. Id. Dr. Berry noted that Plaintiff's test showed "diffuse deficits in speed of processing concentration and attention." Id. Dr. Berry noted that Plaintiff's symptoms could be consistent with adult ADHD but is more likely associated with traumatic brain injury she suffered as a child. Id. Plaintiff stated that she did not have any current mood or anxiety symptoms, no feelings of depression, and no suicidal ideations. Id. Plaintiff "denies being a worrier or feeling tense throughout the day." Id. Plaintiff did report forgetfulness, inability to complete tasks, impulsive behavior, and is easily distracted. Id. Dr. Berry noted that Plaintiff will begin taking Strattera and will return for a follow up. Id. at 493.

On April 27, 2011, Plaintiff was seen for a follow-up in the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. at 496. Plaintiff noted that she had been sober for approximately sixteen months and had attended fifteen meetings since the last doctor's appointment. Id. Plaintiff reported that she is doing well, has a sponsor, and the Strattera prescription is helping her. Plaintiff stated that she has a tooth ache but did not use the medication provided by her dentist and is having dental surgery future one to two weeks. Plaintiff was prescribed an addition suboxone script. Id. at 496. Plaintiff noted that she has not had any cravings, side effects, and withdrawal symptoms. Id.

On May 3, 2011, Plaintiff visited Dr. Berry for a follow up for her ADHD symptoms, mood disorder, and opioid dependence. Id. at 498. Plaintiff stated that her Strattera prescription was helping her "to a mild degree." Plaintiff's therapist noted that her medication makes her sleep but denied any other effects. Id. Plaintiff appeared "mildly uneasy and anxious," but Dr. Abel noted

that that maybe her "baseline." Id. Plaintiff's prescription to Strattera was increased and will continue with the Suboxone medication. Id.

On May 17, 2011, Plaintiff visited Dr. Haut at WVU Healthcare. Id. at 500. Plaintiff reported that there were no changes since her medication but stated that she is "more timely." Id. Plaintiff noted that she has a "fair understanding but need to make notes to recall." Id. Plaintiff appeared alert and oriented and tended to be rushed and lose focus. Id. Plaintiff was slow to respond to "cues to slow down and refocus." Id. Plaintiff was informed that she should go slow, steady, and be "aware of loss of focus and refocusing." Id.

On May 18, 2011, Plaintiff met with Dr. Berry and reported that she had her dental procedure and was able to manage the pain. Id. at 501. Plaintiff also noted that she will have another procedure in the future and will have multiple teeth extracted. Id.

On June 22, 2011, Plaintiff had a follow up at the COAT clinic with Dr. Skidmore. Id. at 502. Plaintiff's visit included medication management, addiction education, and an evaluation of progress. Id. Plaintiff noted that she has been sober since her last doctor's visit. Id. Plaintiff noted that she does not have any cravings, side effects, or withdrawal symptoms. Id.

On July 20, 2011, Plaintiff had a follow-up at the COAT clinic with Dr. Berry regarding medical management, addiction education, and evaluation of progress. Id. Plaintiff stated that she was sober for approximately nineteen months and has attended four meetings since her last doctor's visit. Id. at 507. Plaintiff reported continual dental pain which was relieved when she has taken extra doses of suboxone. Id. Plaintiff was since prescribed amoxicillin. Id. Plaintiff's suboxone dose was increased for the month and was instructed to continue her suboxone treatment. Id.

On August 22, 2011, Plaintiff had a follow-up at the COAT clinic with Dr. Berry regarding medical management, addiction education, and an evaluation of progress. Id. at 509. Plaintiff stated that her dental surgery had been postponed and is treated with anti-biotics. Plaintiff stated that she has been taking her regular suboxone medication and Tylenol for her tooth pain. Plaintiff noted that she appears "yellow" in the morning, which dissipates throughout the day. Id. Plaintiff did not appear yellow during the doctor's appointment. Plaintiff noted that she has maintained her sobriety. Id.

On October 12, 2011, Plaintiff visited the COAT clinic for medication management, addiction education, and evaluation of progress. Id. at 515. Plaintiff stated that she has done well with her dental surgery and stated that she has dealt with the pain well. Plaintiff stated that she is feeling much better and continues to stay clean. Plaintiff has no complaints, cravings, side effects, or withdrawal symptoms. Id. Plaintiff will reduce her medication to 12mg of suboxone and will continue visiting the COAT clinic. Id.

On November 9, 2011, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Plaintiff noted that she was sober for two years and continues to do well. Id. at 518. Plaintiff noted that she is trying to lower her suboxone dose after the new year. Plaintiff noted no cravings, side effects, nor withdrawal symptoms. Id. Plaintiff is recommended to continue following up with the COAT clinic. Id.

On December 7, 2011, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. at 520. Plaintiff stated that she had been sober for twenty-three months and has recently gone to three meetings. Plaintiff continues to talk with her sponsor and thinking about the effects of reducing her medication. Id. Plaintiff had no cravings, side effects, or withdrawal symptoms. Id.

On February 1, 2012, Plaintiff visited the Coat clinic for medication management, addiction education, and an evaluation of progress. Id. at 523. Plaintiff noted that she has been sober for two years and has been doing very well. Plaintiff stated that she continues to work with her sponsor and all of her dental issues have been resolved. Id. Plaintiff noted no cravings, side effects, nor withdrawal symptoms. Id. Plaintiff was told to continue visiting the COAT clinic. Id.

On February 29, 2012, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. at 526. Plaintiff stated that she had been sober for two years and two months. Id. Plaintiff stated that she had not attended a meeting since the last visit. Id. Plaintiff stated that she "has been doing well," but "[h]as not been doing much recovery work regarding speaking with her sponsor or going to meetings." Id. Plaintiff has sought stress relief through water coloring. Id. Plaintiff was prescribed Crestor and Synthroid by her primary care provider. Id. Plaintiff denied any cravings, side effects, and withdrawal symptoms. Id.

On March 28, 2012, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. at 530. Plaintiff stated that she has been sober for two years and two months and has attended five meetings since her previous doctor's appointment. Id. Plaintiff stated that she continues to do well in her recovery. Id. Plaintiff stated that she had been sick for gastrointestinal issues. Id. Plaintiff does not present with any cravings, side effects, or withdrawal symptoms. Id.

On April 24, 2012, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. at 532. Plaintiff stated that she had been sober for three years and six months. Id. at 532. Plaintiff noted that she was doing well overall and has attended meetings since her last visit. Id. Plaintiff stated that she has some health issues,

specifically dizziness, which improves when Plaintiff drinks orange juice. Plaintiff noted that she is seeing her primary care provider for a workup for diabetes. Id. Plaintiff noted that she is working on Step 5 with her sponsor. Id. Plaintiff noted that she has not had any cravings, side effects, or withdrawal symptoms. Id.

On April 26, 2012, Plaintiff visited WVU Healthcare for a follow up for her anxiety. Id. at 534. Plaintiff reported that she was diagnosed with bipolar disorder, depression, social anxiety, ADHD, and opioid dependence. Id. Plaintiff wished to be prescribed ADHD medication and that Strattera makes her sick. Plaintiff noted that she currently is seen by the COAT clinic and has been sober seven years. Id. Dr. Richmond did not make any changes to Plaintiff's medications but suggests a follow up to establish a working diagnosis and make treatment recommendations as required. Id.

On May 23, 2012, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. at 537. Plaintiff noted that she is doing very well and is tolerating her medication. Id. Plaintiff noted that she is glad to be clean and has no complaints, cravings, side effects, or withdrawal symptoms. Id.

On June 15, 2012, Plaintiff visited the Chestnut Ridge Center for "unknown reasons." Id. at 538. Plaintiff reported that she would like help with her ADHD which manifests in the form of interrupting people. Id. Plaintiff stated that she "is always in a hurry because she can't seem to get out of the house on time 'like a normal person.'" Id.  Plaintiff noted that "she talks too fast, loses her train of thought, and 'daydreams.'" Id.  Plaintiff stated that she worries that "everything is a conspiracy," and that she is nervous who can read her medical records. Id. She stated that she believes that people are "'condemning' her because she comes to a psychiatrist." Id. Plaintiff noted that she previously had been prescribed medication that her husband would sell, and she joined the

methadone clinic to get off Percocet. Id. Plaintiff reported that her mood is "fine", and her sleep schedule is "normal." Id. Plaintiff noted that she stays up late and wakes up "a little before noon to go to work." Id. Plaintiff stated that she is taking Celexa but is no longer taking the sixty mg dose each day. Plaintiff stated that she has never been suicidal, but has had racing thoughts, pressured speech, and expansive.  Id. Plaintiff stated that she does not have excessive spending or reckless behavior with her manic symptoms. Id. Plaintiff stated that one of her episodes has lasted a few hours. Id. Plaintiff reported symptoms of psychosis and worries about people reading her medical records. Id. Plaintiff reported that her life is "good, she has wonderful children, and she is pleased that she owns her own land." Id. Plaintiff was instructed to continue taking Celexa and to follow up with Dr. Berry. Id. Plaintiff was also instructed to start takin Ritalin. Id.

On August 22, 2012, Plaintiff visited Dr. Richmond for a follow up for ADHD. Id. at 543. Plaintiff noted that she has not "received benefit" from her new prescription, Ritalin. Id. Plaintiff claimed to have "difficulty with blurting out when others are talking," her concentration remains poor, but denies affect her appetite, mood, chest pain, or headaches. Id. Plaintiff noted that in October 2012, she will be three years sober. Id. Plaintiff noted that she has occasional cravings but those have not increased with her prescription of Ritalin. Id. Plaintiff's Ritalin prescription was increased, and the doctor planned to switch to longer lasting medication in the future. Id.  Plaintiff was instructed to continue following up with the COAT clinic. Id.

On September 12, 2012, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. at 545. Plaintiff stated that she was been sober for two years and nine months. Id. Plaintiff reported that she was doing well, has had no cravings, and no side effects. Plaintiff noted that she switched from Celexa to Zoloft and has recently been to a few meetings. Id.

12

On September 25, 2012, Plaintiff visited Dr. Richmond for a follow up for her ADHD. Id. at 547. Plaintiff stated that she's not doing well with her Zoloft and has been feeling "a little on the down side." Id. Plaintiff noted that she has had some success with her Ritalin. Id. Dr. Richmond noted that Plaintiff appeared depressed, constricted, anxious, but did not seem paranoid nor delusional. Id. Plaintiff's Ritalin and Zoloft were increased, and Dr. Richmond planned to switch her to a longer lasting medication. Id. Plaintiff was instructed to continue attending the COAT clinic. Id.

On January 9, 2013, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. Plaintiff noted that she was "doing very well," and has noticed significant improvement in her life since being prescribed Ritalin. Id. Plaintiff noted that she has been move active and enjoying activities. Id. Plaintiff noted that she has maintained her sobriety for two years and three months. Id. Plaintiff noted no cravings, side effects, nor withdrawal symptoms. Id.

On February 19, 2013, Plaintiff visited the COAT clinic. Id. at 555. Plaintiff attended the appointment despite having a panic attack prior to the appointment. Plaintiff stated that she has had some questions about medications when she is overwhelmed by anxiety. Id. Plaintiff reported "incipient agoraphobia" and panic attacks and struggled "against the desire to hole up in her house." Id. On March 20, 2013, Plaintiff visited the COAT clinic. Id. at 556. Plaintiff reported that there have been changes that have occurred since being prescribed Ritalin. Id.

On March 20, 2013, Plaintiff visited the COAT clinic. Id. at 556. Plaintiff noted changes since taking Ritalin, including a reduction in hypervigilance. Id. During her session, Plaintiff noted several criteria for her condition to constitute ADHD, and Plaintiff noted that many of the

symptoms do not apply to Plaintiff. Id. Ms. Ferris noted that Plaintiff's mood was euthymic, had a broad affect, and was instructed to follow up at their next appointment. Id.

On April 10, 2013, Plaintiff visited Dr. Berry for individual psychotherapy. Id. at 559. Plaintiff discussed her fear of taking a shower. Id. Plaintiff explained a traumatic incident that occurred in a bathroom and that she is afraid of opening her eyes once she is done rinsing the shampoo from her hair because she is afraid that someone will be right in front of her. Id.

On April 17, 2013, Plaintiff visited Dr. Richmond for a follow up regarding her ADHD. Id. at 560. Plaintiff noted that she is doing well and has found drawing to be pleasurable. Id. Plaintiff reported that she is doing well on Ritalin, but has been feeling depressed, and that her Zoloft has not been working. Id. Plaintiff reported that she takes her blood pressure and heart rate medicine and has maintained consistent results. Id. Dr. Richmond noted that Plaintiff expressed mild to moderate psychomotor agitation; pressured, poor impulse control; and frequently interrupts. Id. Dr. Richmond noted that Plaintiff appeared slightly depressed. Id. Plaintiff's Concerta prescription was increased. Id.

On May 30, 2013, Plaintiff visited Dr. Richmond. Id. at 562. Plaintiff reported that she has been doing well and continues to do well with Suboxone. Id. Plaintiff reported no CP, dyspnea, insomnia, or anorexia. Id. Plaintiff reported that her concentration has improved and that her mood is good and stable. Id. Dr. Richmond noted mild to moderate psychomotor agitation, rapid speech, distractible, and slightly depressed. Id. Plaintiff was instructed to continue taking Concerta and Zoloft and to continue with the COAT clinic. Id.

On June 19, 2013, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. at 564. Plaintiff noted that she continues to do well in her recovery and has a much different outlook on recovery and pills. Id. Plaintiff noted that she

has been sober for over three years. Id. Plaintiff reported that she has had a lot of stress at home and is concerned with hair loss. Id. Plaintiff has stopped ovulating and Dr. Berry believe the hair loss to be a symptom of that. Id. Plaintiff stated that she wished to visit a different therapist to discuss "more significant issues" than previously discussed. Id. Plaintiff stated that she wanted to reduce her prescription of Suboxone. Id. Plaintiff noted no cravings, side effects, or withdrawal symptoms. Id.

On September 16, 2013, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. at 566. Plaintiff reported that she is busy with her new job and has tried lowering her medication. Id. Plaintiff complained of muscle "freezing" along with anxiety and "intense sneezing." Id. Plaintiff expressed desire to continue with her regular dose. Id. Plaintiff stated that she enjoys recovery and is feeling better overall. Id. Plaintiff expressed pleasure in her mental health improvement. Id. Plaintiff noted no cravings, side effects, nor withdrawal symptoms. Id. Plaintiff was instructed to continue Buprenorphine and to follow up with Dr. Richmond. Id. at 557.

On November 8, 2013, Plaintiff visited Holly Thomas, LGSW, for an individual therapy session. Id. at 568. Plaintiff shared her social and trauma history and stated that she was feeling "unsure" about where to go in life. Id. Plaintiff presented with good hygiene, dressed appropriately, made good eye contact, and spoke less rapidly. Id. Plaintiff was instructed to visit Ms. Thomas for weekly individual therapy to focus of mood and processing past trauma. Id.

On November 14, 2013, Plaintiff visited Ms. Thomas for her weekly therapy appointment. Id. at 570. Plaintiff talked about childhood events and has begun to verbalize her past trauma. Id. Plaintiff presented with good hygiene, was appropriately dressed, made good eye contact, spoke

less rapidly, but had difficulty maintaining focus at times. Id. Plaintiff was instructed to continue seeing Ms. Thomas weekly for individualized therapy. Id.

On November 26, 2013, Plaintiff visited Ms. Thomas for her weekly therapy appointment. Id. at 572. Plaintiff discussed events of her childhood and stated that she felt overwhelmed and anxious. Id. Plaintiff presented with good hygiene, dressed appropriately, had good eye contact, but had rapid speech and difficulty maintaining focus. Id. Plaintiff was instructed to continue attending individual therapy. Id.

On December 2, 2013, Plaintiff visited Dr. Richmond for a follow up for her ADHD. Id. at 574. Plaintiff reported that she was pleased to be in therapy with Ms. Thomas and is really opening up. Id. Plaintiff reported that her concentration and focus are fair. Id.  Plaintiff reported that she left her employment because her boss was disrespectful. Id. Plaintiff noted that overall she is doing well and is interested in seeking other ways of coping with her ADHD. Id. Plaintiff expressed mild to moderate psychomotor agitation, rapid speech, and constricted and anxious appearance. Id.

On December 3, 2013, Plaintiff visited Ms. Thomas for her weekly individual therapy. Id. at 576. Plaintiff reported using journaling and visualization to manage her intrusive thoughts. Id. Plaintiff reported that her ADHD continually affects her communication skills. Id. Plaintiff appeared with good hygiene, was dressed appropriately, made good eye contact, but had rapid speech and had difficulty maintaining focus. Id.

On December 10, 2013, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. 576. Plaintiff discussed her desires for the future and discussed her desire to love and take care of herself, while letting go of her struggles. Id. Plaintiff appeared with good hygiene and

dressed appropriately and had fair eye contact. Id. Plaintiff was instructed to continue her weekly therapy. Id.

On December 31, 2013, Plaintiff visited the COAT clinic for medication management, addiction education, and evaluation of progress. Id. at 580. Plaintiff noted that she did well on "8mg for about 2 weeks," but then began feeling anxious, and suffered from insomnia, sweats, and yawning. Id. Plaintiff noted that she has been doing "good" and enjoying life. Id. Plaintiff will see Dr. Haut for her ADHD and enjoys therapy with Ms. Thomas. Id. Plaintiff reported no cravings, side effects, or withdrawal symptoms. Id. Plaintiff was instructed to continue Buprenorphine and will follow up with Dr. Richmond. Id.

On January 2, 2013, Plaintiff visited Dr. Haut for a follow up. Id. at 582. Plaintiff noted that she was seen for therapy regarding her cognitive programs and reported that she has not been able to do treatment on her own. Id. Plaintiff noted that Ritalin has helped, and she is learning strategies to help her better stay on and complete tasks. Id. Plaintiff appeared alert, oriented, not depressed or anxious, and has followed through well with her substance abuse treatment. Id. Plaintiff appeared hyper, restless, and revved up. Id. Plaintiff responded to cues but could only slow down with modeling. Id.

On February 24, 2014, Plaintiff visited Dr. Richmond for a follow up for her ADHD. Id. at 583. Plaintiff reported feeling anxious and she has been worsening menopause symptoms. Id. Plaintiff stated that she has been stressed out due to her physical menopause symptoms. Id. Plaintiff noted that she is working hard in therapy and finds it difficult but believes it will help in the long term. Id. Plaintiff is concerned regarding her toleration of anti-histamines and does want to consider other anti-anxiety medication. Id. Dr. Richmond noted that Plaintiff presented with mild to moderate psychomotor agitation, rapid speech and distractible attention. Id. Plaintiff's affect

was constricted and appeared anxious. Id. Plaintiff was instructed to continue Ritalin and Zoloft and will start Inderal, as well as continue with the COAT clinic. Id.

On March 13, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 586. Plaintiff noted that she has been struggling physically and emotionally due to menopause. Id. Plaintiff reported feeling overwhelmed and depressed, with racing thoughts. Id. Plaintiff stated that she continues to use good coping skills and is secure with her recovery. Id. Plaintiff presented with good hygiene, dressed appropriately for the weather, and maintained good eye contact. Id. Plaintiff was instructed to continue her weekly individual therapy sessions. Id.

On March 11, 2014, Plaintiff visited the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. Plaintiff reported that she is doing well but recently had a severe anxiety episode relating to menopause. Id. Plaintiff inquired about being prescribed Valium. Id. Plaintiff was instructed that Dr. Berry would not prescribe that medication due to her addiction. Id. Plaintiff noted that she has maintained her sobriety. Id. Plaintiff noted no problems with her Subutex, nor does she have cravings, side effects, and withdrawal symptoms. Id. Plaintiff was instructed to continue her Buprenorphine prescription and to follow up with Dr. Richmond. Id.

On March 20, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 590. Plaintiff noted her recent struggles with low self-worth. Id. Plaintiff began discussing past abuse and stated that she has never finished projects for fear that she would not be good enough. Id. Plaintiff appeared with good hygiene, dressed appropriate, and good eye contact. Id. Plaintiff was instructed to continue with her weekly individual therapy sessions. Id.

On March 27, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 592. Plaintiff expressed feelings of low self-esteem due to past experiences. Id. Plaintiff did

communicate previous abuse that was not previously disclosed. Id. Plaintiff appeared with good hygiene, was dressed appropriately, and had fair eye contact. Id. Plaintiff was instructed to continue her weekly individual therapy sessions with Ms. Thomas. Id.

On April 10, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 594. Plaintiff communicated her previous past experiences and how they affect her. Id. Plaintiff reported having a flashback over the past week. Id. Plaintiff reported that she is managing it and is not afraid of the trauma happening again. Id. Plaintiff appeared with good hygiene, was dressed appropriately, and maintained fair amount of eye contact. Id. Plaintiff was instructed to continue with her weekly individual therapy session. Id.

On April 17, 2013, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 596. Plaintiff stated that she has not experienced any more flashbacks. Id. Plaintiff stated she felt "stuck" and wants to make changes in her relationship and move across country. Id. Plaintiff identified reasons for wanting change in her life but is anxious to discuss potential changes with her significant other. Id. Plaintiff appear with good hygiene, was dressed appropriately, and maintained fair amount of eye contact. Id. Plaintiff was instructed to continue her weekly therapy sessions with Ms. Thomas. Id.

On April 15, 2014, Plaintiff visited Dr. Haut for her follow up for her ADHD. Id. at 598. Plaintiff appeared alert and oriented, with a broad but hyper affect. Id. Plaintiff appear impulsive and inattentive, while easily distracted. Id. Plaintiff was instructed to continue using strategies discussed during the appointment for ADHD treatment. Id.

On May 1, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 599. Plaintiff discussed her relationship with her boyfriend and continued to discuss her past trauma. Id. Plaintiff noted no flashbacks and a good mood. Id. Plaintiff appeared with good

hygiene, was dressed appropriately, maintained fair eye contact, normal affect, and an improved focus during the session. Id. Plaintiff was instructed that continue with Ms. Thomas for her weekly individual therapy. Id.

On May 8, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 601. Plaintiff discussed her past trauma and she felt panicked when discussing how the trauma affected her. Id. Ms. Thomas stated that she was able to manage those feelings of panic during the therapy session but stated that she struggled to maintain focus. Id. Plaintiff appeared to have good hygiene, was dressed appropriately, maintained fair eye contact, normal affect, and improved focus. Id. Plaintiff was instructed to continue her weekly individual therapy session. Id.

On May 13, 2014, Plaintiff visited Dr. Haut for a follow up on her cognitive problems. Id. at 603. Plaintiff noted that she is applying for social security and Dr. Haut provided a letter in support. Id. Plaintiff's treatment involved using card tasks to assist but Plaintiff had forgotten to use them. Id. Plaintiff appear alert and oriented, highly distracted by other stimuli, distracted during the "card tasks," but appeared slow and steady approach to the exercise. Id.

On May 29, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 606. Plaintiff discussed her hurt feelings and judgment she feels is imparted by others. Id. Plaintiff discussed her desire to separate the stigma of Plaintiff's Suboxone use. Id. Plaintiff appeared with good hygiene, was well dressed, maintained fair eye contact, and normal affect. Id. Plaintiff was instructed to continue with her weekly individual weekly. Id.

On May 29, 2014, Plaintiff visited Dr. Berry for a COAT clinic follow up for medication management, addiction education, and an evaluation of progress. Id. at 608. Plaintiff noted dental issues which she needs to repair due to pain. Id. Plaintiff noted that her pharmacist who accused her of being an addict and was "confrontational." Id. Plaintiff noted that she maintained her

sobriety and has appeared to be functioning well. Id. Plaintiff noted no cravings, side effects, nor withdrawal symptoms. Id. Plaintiff was instructed to continue with her Buprenorphine prescription and to continue following up with Dr. Richmond. Id.

On June 2, 2014, Plaintiff visited Dr. Richmond for a follow up for Plaintiff's ADHD. Id. at 610. Plaintiff reported doing well and taking natural remedies for her menopause. Id. Plaintiff reported that "black cohosh" helped with her symptoms and her sleep. Id. Plaintiff noted that she is doing well with therapy and Dr. Berry. Id. Plaintiff noted that she is utilizing behavioral strategies that she learned from her appointments with Dr. Haut. Id. Plaintiff appeared alert, fair attention, linear thought process, and good eye contact. Id. Plaintiff was instructed to continue taking Ritalin and Zoloft and to continue in the COAT clinic and therapy. Id.

On June 6, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 613. Plaintiff noted that she has been working to improve her focus using cards provided to her from Dr. Haut. Id. Plaintiff discussed feelings about her relationship with her son. Id. Plaintiff appeared with good hygiene, dressed appropriate, maintained a fair amount of eye contact, and her affect was normal. Id. Plaintiff was instructed to continue with her weekly individual therapy. Id.

On June 12, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 615. Plaintiff reported that she was in a good mood and verbalized her past abuse and the effect it has on her presently. Id. Plaintiff discussed her addiction and trying to parent while being addicted. Id. Plaintiff appeared with good hygiene, dressed appropriately, had fair eye contact, and presented with normal affect. Id. Plaintiff was instructed to continue with her weekly individual therapy. Id.

On June 16, 2014, Plaintiff visited the COAT clinic for a follow up for medication management, addiction education, and an evaluation of progress. Id. at 617. Plaintiff noted that

she continues to have dental pain and her Suboxone prescription assists with pain management. Id. Plaintiff reported that her life over all is going well. Id. Plaintiff noted that she babysits her neighbors and has begun golfing. Id. Plaintiff noted she "loves" sobriety. Id. Plaintiff reported no cravings, side effects, or withdrawal symptoms. Id. Plaintiff was instructed to continue her Buprenorphine prescription and to continue with Dr. Richmond. Id.

On July 3, 2014, Plaintiff visited Dr. Haut for a follow up regarding her attention and cognitive issues. Id. at 619. Plaintiff reported poor follow up with her assigned card tasks. Id. Plaintiff presented as alert, oriented, restless, hyper, and would get up and pace while being easily distracted. Id. Plaintiff was instructed to continue to "work on the big picture" and reviewed the goals and strategies set in her treatment. Id.

On July 15, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 620. Plaintiff began discussing the death of her child and did panic slightly during the session as she has never discussed this trauma before. Id. Plaintiff presented with good hygiene, dressed appropriately, had fair eye contract, and her affect was normal. Id. Plaintiff was instructed to continue her weekly individual therapy sessions. Id.

On July 14, 2014, Plaintiff visited the COAT clinic for a follow up regarding medication management, addiction education, and an evaluation of progress. Id. at 622. Plaintiff reported dental pain has improved after treatment by her dentist. Id. Plaintiff reported further struggles with her menopause and was encouraged to follow up with her primary care provider. Id. Plaintiff and Dr. Berry discussed continuing Plaintiff on her current Suboxone treatment. Id. Plaintiff noted that Ms. Thomas and Dr. Haut's treatment have been helpful. Id. Plaintiff noted no cravings, side effects, and withdrawal symptoms. Id. Plaintiff was instructed to transition from Dr. Richmond to Dr. Hines. Id.

On July 25, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 624. Plaintiff reported no increase in symptoms, but verbalized feelings of anger and sadness related to past trauma. Id. Plaintiff presented with good hygiene, dressed appropriately, maintained fair eye contact, and her affect appeared normal. Id. Plaintiff was instructed to continue her weekly individual therapy sessions. Id.

On July 29, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 626. Plaintiff expressed that she felt overwhelmed because she has been processing a lot of trauma in her sessions. Id. Plaintiff stated that she wished to focus on managing her stressors and discussed putting off doctor's appointments out of fear. Id. Plaintiff expressed her desire to do a better job of taking care of her physical and mental health. Id. Plaintiff presented with good hygiene, dressed appropriately, maintained fair amount of eye contact, and her affect appeared normal. Id. Plaintiff was instructed to continue with her weekly individual therapy sessions. Id.

On August 7, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 628. Plaintiff stated that she was feeling foolish lately and reported having intrusive and negative thoughts ruminating regarding a particular event. Id. Plaintiff stated she is feeling sad and anxious. Id. Plaintiff presented with good hygiene, dressed appropriately, maintained a fair amount of eye contact, and her affect appeared normal. Id. Plaintiff was instructed to continue with her weekly individual therapy sessions. Id.

On August 8, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id.  at 630. Plaintiff talked about her grief from her childhood and discussed her childhood abuse. Id. Plaintiff presented with good hygiene, dressed appropriately, maintained good eye contact, normal affect, and became tearful at times. Id. Plaintiff was instructed to continue with her weekly individual therapy sessions. Id.

On September 4, 2014, Plaintiff visited Dr. Haut for a follow up for her ADHD. Id. at 632. Plaintiff could only recall one strategy that was presented to her as treatment for her ADHD. Id. Plaintiff reported that she only uses some of the treatment strategies. Id. Plaintiff appeared alert, oriented, hyper-rushed, and pressured, but did better with cues. Id. Dr. Haut instructed Plaintiff to work on being aware of the big picture and use the strategies provided during her sessions. Id.

On September 25, 2014, Plaintiff visited Dr. Hines for a follow up on her medication management. Id. at 633. Plaintiff reported doing well overall but would not like to make any medication changes for now. Id. Plaintiff reported that she has been working on behavioral changes but finds it difficult to implement the strategies. Id. Dr. Hines reported that she needed frequent assurances throughout the appointment. Id. Plaintiff appeared casually dressed and cooperative with the conversation. Id. Plaintiff's rate of speech increased, and Dr. Hines noted anxious psychomotor changes. Id. Plaintiff described her mood as "okay," but presented with a constricted affect. Id. Plaintiff denies suicidal or homicidal ideation. Id. Plaintiff's judgment and insight appears good. Id. Plaintiff was instructed to continue with her Ritalin, Zoloft, and Suboxone prescriptions. Id. Plaintiff will continue with Ms. Thomas and Dr. Haut. Id.

On September 26, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 638. Plaintiff stated that she was anxious when she came to the session and had difficulty filling out paperwork for her social security benefits. Id. Plaintiff noted that she sometimes "loses" time although it is only a few minutes at a time. Id. Plaintiff stated that she is worried about this and "feels like something is wrong with her." Id. Plaintiff presented with good hygiene, dressed appropriately, maintained good eye contact, her affect appeared normal, but her speech was pressured and difficult to follow. Id. Plaintiff was instructed to continue with her weekly individual therapy sessions. Id.

On October 2, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 636. Plaintiff discussed her ex-significant other who still lives with her and expressed her desire to make changes in her life. Id. Plaintiff presented with good hygiene, maintained good eye contact, her affect appeared normal, and her speech was pressured. Id. Plaintiff was instructed to continue with her weekly individual therapy sessions. Id.

On October 2, 2014, Plaintiff visited the COAT clinic for a follow up in medication management, addiction education, and an evaluation of progress. Id. at 640. Plaintiff attended her appointment one week early because she had an appointment with Dr. Haut and was in the building. Id. Plaintiff reported that she has been "struggling" with her PTSD which is something she is working on with Ms. Thomas. Id. Plaintiff believes her therapy has been helpful. Id. Plaintiff noted no cravings, side effects, nor withdrawal symptoms. Id. Plaintiff was instructed to continue taking Buprenorphine, and continue following up for Dr. Hines, Dr. Byron, and Ms. Thomas. Id. at 641.

On October 2, 2014, Plaintiff visited Dr. Haut for a follow up on her ADHD. Id. at 642. Plaintiff reported being negative about her progress but after reviewing her progress with her, she noted some improvement. Id. Plaintiff appeared alert and oriented, but distractible and pressured. Id. Plaintiff made extraneous comments but can focus when Dr. Haut cued her. Id. Dr. Haut noted that Plaintiff is hard on herself. Id.

On October 17, 2014, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 644. Plaintiff continued to discuss her past trauma and reported some PTSD symptoms, including nightmares and intrusive thoughts. Id. Plaintiff discussed her desire to help others that might be in situations similar to her past. Id. Plaintiff appeared with good hygiene, dressed appropriately, maintained good eye contact, normal affect, and her speech was pressured

and somewhat difficult to follow. Id.  Plaintiff was instructed to continue with her weekly individual therapy sessions. Id.

On November 6, 2014, Plaintiff visited Dr. Haut for a follow up on her ADHD. Id. at 646. Plaintiff initially had difficulty recalling the goals but with cues was able to recall and recognize. Id. Plaintiff then described her use of the strategies in her everyday life but needed cues and examples of strategies to recall what she uses. Id. Plaintiff presented as alert, oriented, scattered, but able to get back on task with cues. Id. Plaintiff was fifteen minutes late to her appointment but was "not as ready to get up and leave." Id.

On January 5, 2015, Plaintiff visited Dr. Hines for a follow up on her medication management. Id. at 647. Plaintiff reported that she was "doing fine." Id. Plaintiff stated that she feels like "things are going well." Dr. Hines inquired into the work that Plaintiff and Ms. Thomas were doing, however, Plaintiff was hesitant to answer the question. Id. Plaintiff reported that her medication regimen is effective, and she is not interested into changing it. Id. Plaintiff noted that her concentration and focus have been improving to which Plaintiff attributes to her medication and Ms. Thomas and Dr. Haut. Id. Plaintiff reported that her sleep is "pretty good," and presents no depressive symptoms. Id. Plaintiff presented with a soft, fluent speech, and no anxious psychomotor changes. Id. Plaintiff appeared with a mildly constricted affect but denies any suicidal or homicidal ideation. Id. Dr. Hines noted that Plaintiff's insight and judgment appear good. Id. Plaintiff was instructed to continue Ritalin, Zoloft, and Suboxone. Id. Plaintiff with continue with her therapy sessions with Ms. Thomas and her behavioral strategies with Dr. Haut. Id.

On January 5, 2015, Plaintiff visited the Wedgewood Family Practice and Psychiatry Associates, Inc. R. 436-439. Dr. William Mitchell noted that Plaintiff presented with symptoms of an acute upper respiratory infection, which were occurring for approximately four days. Id. at 436.

Plaintiff complained of fever, chest congestion, productive cough, dyspnea, headache, hoarseness, nausea, sore throat, and vomiting. Plaintiff also complained of constipation. Dr. Mitchell noted that Plaintiff has had a history of hyperlipidemia, gastroesophageal reflux, anxiety, attention deficit hyperactivity disorder, depression, and hypothyroidism. Plaintiff noted that she was taking Zoloft, Nicodern, Nicotine, Aspirin, Ritalin, and Vitamin D. Id. at 437. Plaintiff noted that she has smoked since she was twelve years old and smokes approximately a half a pack per two weeks. Id. A chest X-Ray was performed due to cough, congestion, and fever. Id. at 740. The X-Ray noted a normal study, non-enlarged heart, clear lung fields, and intact regional osseous structures are intact. Id.

On January 19, 2015, Plaintiff visited the COAT clinic for a follow up for medication management, addiction education, and an evaluation of progress. Id. at 650. Plaintiff stated that she is feeling better and has gotten over the flu. Id. Plaintiff reported that she is working on her issues in her life but is grateful to be clean and sober. Id. Plaintiff noted that she had no cravings, side effects, and withdrawal symptoms. Id. Plaintiff was instructed to continue taking Buprenorphine, and to follow up with Dr. Hines and Dr. Byron. Id.

On January 20, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 656. Plaintiff presented with racing thoughts, intrusive thoughts, difficulty maintaining focus, difficulty sitting still, and forgetfulness. Id. Ms. Thomas noted that Plaintiff has poor functioning, fair eye contact, rapid and difficult to follow speech, but appeared in appropriate dress. Id. Ms. Thomas noted that there is no suicide and homicide risk and a moderate risk of relapse. Id. Plaintiff noted that she wants to continue trauma work and inquiring into how her trauma continues to affect her. Id.

On January 20, 2015, Plaintiff visited Wedgewood Primary Care & Psychiatry for an evaluation of her hyperlipidemia. Id. at 735. Plaintiff denied any myalgias, arthralgias, headaches,

or GI upset. Id. Plaintiff noted that she is not currently on any medication. Id. Plaintiff noted that she had previously tried Crestor and Niaspan. Id. Plaintiff also complained of constipation and described excessive straining and passing lumpy/hard stools. Id. Plaintiff admitted that she does not drink enough water and has a low fiber diet. Id. Plaintiff noted urinary incontinence and experiencing this for approximately one year. Id. Plaintiff noted dribbling, inability to empty bladder, leakage of urine, urgency, but not dysuria and hematuria. Id. Dr. Byron noted that Plaintiff was moderately obese, both ears are normal without anomaly, full range of neck motion without pain, and no enlarged thyroid. Id. at 737. Plaintiff's lungs are clear, normal sinus rhythm, with no wheezes, rales, rubs or rhonchi. Id. Dr. Byron noted that Plaintiff's abdomen is soft, non-tender without rebound or guarding, normoactive bowel sounds are heard without rush, and no palpable masses or hepatosplenomegaly is appreciated. Id. Dr. Byron noted no lymph node enlargements or tenderness in the neck, axillae, or groin. Id. Plaintiff was diagnoses with mixed hyperlipidemia, hypothyroidism, constipation, urge incontinence, and addiction. Id. Plaintiff was prescribed with Ditropan and Nicotine. Id.

On February 10, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 657. Ms. Thomas noted poor functioning, fair eye contact, rapid speech, but appropriate dress. Id. Ms. Thomas noted no suicidal or homicidal risks, and a moderate risk of relapse. Id. Plaintiff noted that she had difficulty remembering her appointment but was able to recall memories from her childhood. Id.

On March 4, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 658. Plaintiff appeared with racing thoughts, intrusive thoughts, difficulty maintaining focus, difficulty sitting still, flashbacks, worry, and forgetfulness. Id. Ms. Thomas noted that Plaintiff had

28

poor functioning, fair eye contact, normal speech, and dressed appropriately. Id. Ms. Thomas noted no suicidal or homicidal risk, and a moderate risk of relapse. Id.

On March 10, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 659. Plaintiff presented with racing thoughts, intrusive thoughts, difficulty maintaining focus, difficulty sitting still, flashbacks, feelings of sadness, and forgetfulness. Id. Ms. Thomas appeared with fair functioning, fair amount of eye contact, normal speech, and appropriate dress. Id. Ms. Thomas noted no suicidal or homicidal risk and moderate risk of relapse. Id. Ms. Thomas reported modest progress and that Plaintiff has trouble staying focused and concerned about her forgetfulness. Id.

On March 26, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. Ms. Thomas noted that Plaintiff presented with racing and intrusive thoughts, difficulty maintaining focus, difficulty sitting still, flashbacks, feelings of sadness, and forgetfulness. Id. Ms. Thomas noted that she has fair functioning, fair eye contact, normal speech, and appropriate dress. Id. Plaintiff noted no suicidal and homicidal risk and a moderate risk of relapse. Id. Ms. Thomas noted that Plaintiff presented with no risk of relapse and has been to maintain her sobriety. Id.

On March 30, 2015, Plaintiff visited the COAT clinic for a follow up for medication management, addiction education, and an evaluation of progress. Id. at 652. Plaintiff appeared having missed a previous appointment and reported stress regarding her partner's medical issues. Id. Plaintiff expressed concerns for her memory and focus and reported losing things and missing appointments. Id. Plaintiff noted no cravings, side effects, and withdrawal symptoms. Id. Plaintiff was instructed to continue taking Buprenorphine and to follow up with Drs. Hines and Byron. Id.

On April 8, 2016, Plaintiff visited Wedgewood Primary Care & Psychiatry for an evaluation of her gastroesophageal reflux disease. Id.  at 721. Plaintiff noted that she is not

currently taking any medications, and has been complaining of dizziness, lightheadedness, altered gait, blurred vision, weakness, and myalgia. Id. Dr. Byron appeared with normal ears without any obvious anomalies, normal ear drums and auditory canals. Id. at 723. Plaintiff appears a full range of motion without pain and no significant lymphadenopathy or mass. Id. Dr. Byron noted that Plaintiff's trachea is midline, no enlarged thyroid, no palpable nodule, and no evidence of jugular venous distention. Id. Dr. Byron noted that Plaintiff's lungs are clear, with no wheezes, rales, rubs, or rhonchi. Id. Plaintiff had a normal sinus rhythm. Id. Plaintiff was diagnoses with bilateral labyrinthine dysfunction and prescribed Meclizine and Nexium. Id.

On April 9, 2015, Plaintiff visited Dr. Haut for a follow up for her ADHD. Id.  at 654. Plaintiff noted that she has not been seen for months due to bad weather and her ADHD. Id. Plaintiff reported doing better and gave examples of the strategies that she utilizes to cope and manage her symptoms. Id. Dr. Haut noted that Plaintiff can be hard on herself but is aware of it and is generally positive. Id. Dr. Haut noted that Plaintiff needed cues to recall strategies. Id. Plaintiff presented as alert; oriented; her affect was broad and appropriate; settled, but was late; responded well to cues, but still appeared restless. Id.

On April 9, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 661. Ms. Thomas noted that Plaintiff presented with fair eye contact, fair functioning, congruent affect, normal speech, and dressed appropriately. Id. Ms. Thomas noted that Plaintiff has no risk of suicide or homicide and a moderate risk of relapse. Id. Ms. Thomas noted moderate progress. Id. Plaintiff reported that she has begun drafting a letter to her oldest son to address their relationship and continues to struggle with remembering appointment times. Id.

On April 9, 2015, Plaintiff visited Dr. Haut for a follow up on her cognitive and behavioral problems stemming from her ADHD. Id. At 807. Plaintiff reported not being seen for months due

to the weather but reported doing better and was able to demonstrate strategies that she utilizes to cope with and manage her symptoms. Id. Plaintiff noted that she is hard on herself but is capable of generally being positive. Id. Dr. Haut noted that Plaintiff needed cues to recall the strategies. Id. Plaintiff presented as alert, oriented with a broad and appropriate affect. Id. Dr. Haut noted that Plaintiff was a little more settled, was late but less hectic, and is more accepting now. Id. Plaintiff responded to cue and praise but is still restless. Id.

On April 23, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 662. Ms. Thomas noted that Plaintiff presented with racing thoughts, intrusive thoughts, difficulty maintaining focus, difficulty sitting still, and having flashbacks. Id. Ms. Thomas noted that Plaintiff's functioning was good, congruent affect, fair eye contact, normal speech, and appropriately dressed. Id. Ms. Thomas noted that Plaintiff has no risk of suicidal or homicidal risk and a moderate risk of relapse. Id.

On May 7, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 663. Ms. Thomas noted that Plaintiff presented with flashbacks, intrusive thoughts, feelings of anxiety of fear, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, and memory problems. Id.  Plaintiff presented with fair eye contact, her speech was difficult to follow, but was dressed appropriately. Id. Ms. Thomas noted that Plaintiff present no suicidal or homicidal risk and moderate risk of relapse. Id. Ms. Thomas noted that Plaintiff struggled with managing her thoughts and maintaining focus. Id.

On May 21, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 686. Plaintiff presented with flashbacks, intrusive thoughts, feelings of anxiety of fear, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, and memory problems. Id. Plaintiff had fair functioning, good eye contact, normal speech, and dressed

appropriately. Id. Ms. Thomas noted no concerns of suicide or homicide and moderate risk of relapse. Id. Plaintiff reported feeling better after her therapy session. Id.

On June 4, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy sessions. Id. at 687. Plaintiff reported flashbacks, intrusive thoughts, feelings of anxiety of fear, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, memory problems. Id. Ms. Thomas noted that Plaintiff had good functioning, congruent affect, good eye contact, normal speech, and appropriate dress. Id. Ms. Thomas noted no risk of suicide or homicide and moderate risk of relapse. Id.

On June 18, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy sessions. Id. at 688. Plaintiff presented with flashbacks, intrusive thoughts, feelings of anxiety, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, and memory problems. Id. Ms. Thomas noted that Plaintiff presented with good functioning, congruent affect, good eye contact, normal speech, and appropriate dress. Id. Plaintiff noted no risk of suicide or homicide and moderate risk of relapse. Id. Ms. Thomas noted very good progress. Id.

On June 22, 2015, Plaintiff visited the COAT clinic for a follow up for her medication management, addiction education, and an evaluation of progress. Id. at 671. Plaintiff stated that she is doing well and is occupying her time by doing household chores and projects. Id. Plaintiff noted no complaints and is satisfied with her life. Id. Plaintiff noted that she is setting boundaries and is successful at utilizing the boundaries. Id. Plaintiff noted no issues with her medication as well as no cravings, side effects, or withdrawal symptoms. Id. Plaintiff was instructed to continue with her prescribed Buprenorphine and to follow up with Dr. Hines, Dr. Byron, Dr. Haut, and Ms. Thomas. Id.

On June 23, 2015, Plaintiff visited Dr. Haut for a follow up on her cognitive problems. Id. at 673. Dr. Haut noted that Plaintiff was late for her appointment and had missed her last appointment. Id. Plaintiff was able to recall the goals and strategies and responded well when provided support and cues. Id. Plaintiff appeared alert, oriented, more focused, and calmer. Id. Dr. Haut noted that Plaintiff responded well to praise and reinforcement, presented with no depression, had good insight and increased awareness, and was able to recognize and correct behavior. Id.

On July 1, 2015, Plaintiff visited Dr. Quigley for medication management after Dr. Richmond transferred her care to him. Id. at 674. Plaintiff reported doing well and having dental work completed to address her abscessed tooth. Id. Plaintiff noted her mood, sleep, and appetite have all been well. Id. Plaintiff noted that her ADHD symptoms fluctuated but are overall stable. Id. Plaintiff noted that her Ritalin and Zoloft "are 'doing what they need to'" do and denies any adverse effects caused by the medication. Id. Plaintiff noted no adverse effects to her medication and no thoughts of self-harm and harm to others. Id. Plaintiff requested no change in her medical history. Id. Dr. Quigley noted that Plaintiff was casually dressed and made pleasant and cooperative conversation. Id. Plaintiff's speech was soft but fluent with no anxious psychomotor changes. Id. Plaintiff reported a good mood but had a mildly constricted affect. Id. Plaintiff denied any suicidal or homicidal thoughts, no perceptual disturbances, and her insight and judgment were good. Id. Plaintiff was instructed to continue with her therapy and follow ups with Dr. Berry. Id.

On July 23, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 689. Plaintiff presented with flashbacks, intrusive thoughts, feelings of anxiety and fear, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, and memory problems. Id. Ms. Thomas noted Plaintiff had good functioning, congruent affect, good eye contact, normal speech, and appropriate dress. Id. Ms. Thomas noted no risk of suicide or homicide

and low risk of relapse. Id. Ms. Thomas noted good progress. Id. Plaintiff noted that she communicated with her sister which triggered thoughts of her past, but did not experience a trauma response, and verbalized her feelings of sadness. Id.

On August 13, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 690. Plaintiff presented with flashbacks, intrusive thoughts, feelings of anxiety, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, and memory problems. Id. Ms. Thomas noted that Plaintiff had good functioning, congruent affect, good eye contact, normal speech, and appropriate dress. Id. Ms. Thomas noted no risk of suicide or homicide and low risk of relapse. Id. Ms. Thomas described Plaintiff's progress as "very good." Id.

On August 20, 2015, Plaintiff visited Dr. Haut for a follow up of her cognitive disorder. Id. at 677. Dr. Haut noted that Plaintiff missed her last appointment because she was not focused when writing the date and time down on her calendar. Id. Plaintiff noted that she is aware of the strategies suggested by Dr. Haut but only consistently uses one. Id. Plaintiff appear alert, oriented, hyper and distractible. Id. Plaintiff presented with rapid breathing, no focus, but was able to get re-focused with cues. Id. Plaintiff appeared difficult on herself. Id.

On September 21, 2015, Plaintiff visited the COAT clinic for follow up on medication management, addiction education, and an evaluation of progress. Id. Plaintiff noted that she is grateful for her recovery but is lonely and spends most of her time preparing her house for the winter months. Id. Plaintiff noted that she had not seen Ms. Thomas in a month but will see Dr. Haut. Id. Plaintiff noted that she still has to get dental work completed. Id. Plaintiff noted no cravings, side effects, or withdrawal symptoms. Id. Plaintiff was instructed to continue Buprenorphine and to follow up with Dr. Hines, Byron, Haut and Ms. Thomas. Id. at 679.

On September 22, 2015, Plaintiff visited Dr. Haut for a follow up on Plaintiff's ADHD and cognitive problems. Id. Plaintiff was thirty minutes late for her appointment and utilized breathing exercises for weeks but had not done so in the recent weeks. Id. Plaintiff appeared alert, oriented, hyper, and inattentive at first. Id. Dr. Haut noted that with practice she improved. Id. Plaintiff was hypertensive and self-conscious. Id. Dr. Haut review the treatment plan and strategies in practice before he follow-up. Id.

On October 6, 2015, Plaintiff visited Dr. Ramsey for pain management. Id. at 681. Plaintiff reported that she is doing well and has been sober for ten years. Id. Plaintiff noted that her mood, sleep, and appetite is good. Id.  Plaintiff noted a slight increase in appetite but plans to increase her physical exercise. Id. Plaintiff stated she is compliant with her medications and denies any side effects from those medications. Id. Plaintiff noted that her attention and focus are stable. Id. Plaintiff noted that she struggles with self-esteem and wanting to be independent but feels limited in her abilities. Id. Plaintiff presented in casual dress, with pleasant and cooperative conversation. Id. Plaintiff had soft and fluent speech with no anxious psychomotor changes. Id. Plaintiff's mood appeared "a little nervous" with mildly constricted affect. Id. Plaintiff denied any suicidal or homicidal ideation. Id. Plaintiff strayed off topic but was redirectable. Id. Plaintiff continued taking Ritalin, Zoloft, and Suboxone. Id.

On October 27, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 691. Plaintiff presented with flashbacks, intrusive thoughts, feelings of anxiety and fear, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, memory problems, and nightmares. Id. Ms. Thomas noted that Plaintiff had fair functioning, good eye contact, normal speech, and appropriate dress. Id. Plaintiff had no risk of homicide or suicide and

low risk of relapse. Id. Ms. Thomas noted that Plaintiff's progress has "decompensated" and her social security interviews have triggered trauma symptoms and memories. Id.

On October 30, 2015, Plaintiff visited Wedgewood Primary Care & Psychiatry for an evaluation of her hyperlipidemia. Id. at 730. Plaintiff noted that her previous medication caused her nausea and stopped taking it after one week. Id. Plaintiff took Crestor for one year from February 2012 to February 2013, tolerated the medication well, but stopped taking the medication for an unknown reason. Id. Plaintiff also complained of musculoskeletal pain located in her left and right wrist. Id. Plaintiff also noted symptoms such as numbness in the thumb, index finger, and middle finger. Id. Plaintiff has utilized a soft wrist brace, but not a splint. Id. Dr. Byron diagnosed Plaintiff with "mixed hyperlipidemia, major depressive disorder (single episode, partial remission), nicotine dependence, and wrist pain. Id. at 732. Dr. Byron ordered a comprehensive metabolic panel and lipid. Id. at 729. Plaintiff was prescribed Crestor and was instructed to follow up in three months. Id. Dr. Byron noted that Plaintiff's hyperlipidemia was poorly controlled. Id. at 733.

On November 5, 2015, Plaintiff visited Ms. Thomas for her weekly individual therapy session Id. at 692. Plaintiff presented with flashbacks, intrusive thoughts, feelings of anxiety and fear, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, memory problems, nightmares, and disassociation. Id. Ms. Thomas noted that Plaintiff had fair functioning, congruent affect, good eye contact, normal speech, and dressed appropriately. Id. Plaintiff noted no risk of homicide or suicide and low risk of relapse. Id. Ms. Thomas noted that Plaintiff's progress has "decompensated," and Plaintiff reported having frequent intrusive thoughts and struggling with staying present. Id.

On December 14, 2015, Plaintiff visited the COAT clinic for a follow up on medication management, addiction education, and an evaluation of progress. Id. at 821. Plaintiff reported that she had been sober for ten years and two months and continues to do well in life and is satisfied with her daily existence. Id. Plaintiff noted that has been reading "a lot of dooms-day material on the internet which has increased her anxiety. Id. at 821. Plaintiff was encouraged to stop reading those materials and "was grateful for the permission to no longer focus on these hypothetical events." Id. Plaintiff noted that she will no longer be seeking Ms. Thomas for therapy due to financial reasons. Id. Plaintiff denied any problems, noted that she is stable on her medication, and report no cravings, side effects, or withdrawal symptoms. Id. Plaintiff was instructed to continue Buprenorphine and to follow up with Drs. Hines and Byron. Id.

On December 17, 2015, Plaintiff visited Dr. Haut for outpatient treatment session to address her ADHD. Id. At 823. Plaintiff noted that she missed the last appointment because she was unfocused and left the house without her keys and locked herself out of the house. Id. At 823. Plaintiff noted that she often says things without thinking about how they affect others and her relationships. Id.

On March 7, 2016, Plaintiff visited Wedgewood Family Practice & Psychiatry complaining of symptoms of an acute upper respiratory infection. Id. at 725. Plaintiff noted that her symptoms begun two weeks prior to the appointment. Id. Plaintiff additionally complained of chest congestion, a productive cough, and a sore throat. Id. Labs were also conducted on Plaintiff which included a lipid panel and comprehensive metabolic panel. Id. at 724. Plaintiff's labs were deemed "okay." Id. Plaintiff was diagnoses with mixed hyperlipidemia. Id. at 727.

On March 7, 2016, Plaintiff visited the COAT clinic for a follow up on medication management, addiction education, and an evaluation of progress. Id. at 824. Dr. Berry noted that

Plaintiff reported being sober for ten years and five months but continues to worry about things like doomsday events and is growingly suspicious of the government. Id. Plaintiff reported that she was increasingly depressed since the last visit and a new anti-depressant regimen was discussed with her. Id. Plaintiff noted that she did not want to change medications and wanted to see how she progressed on her current medication. Id. Plaintiff noted that she had two different dental surgeries and medication was prescribed to her. Id. Plaintiff noted no cravings, side effects, nor withdrawal symptoms. Id. Plaintiff was instructed to continue with her Buprenorphine prescription and to follow up with Drs. Hines, Byron, and Haut. Id. at 825.

On March 8, 2016, Ms. Thomas authored a discharge note that Plaintiff she was unable to pay the pro bono fee of $20 and requested a referral to a therapist who takes her insurance. Id. at 753. Plaintiff was informed that she can continue her appointments with Ms. Thomas at any time. Id.

On April 8, 2016, Plaintiff visited Wedgewood Primary Care and Psychiatry for an evaluation of gastroesophageal reflux disease. Id. At 721. Plaintiff reported that she is not taking any medications but had previously taken Nexium. Id. Plaintiff complained of dizziness or lightheadedness. Id. Plaintiff associated the symptoms with altered gait, blurred vision and weakness myalgias. Id. Plaintiff noted that she has smoked since age twelve but denied any alcohol or recreational drug use. Id. Plaintiff was diagnosed with bilateral labyrinthine dysfunction. Id.

On April 19, 2016, Plaintiff visited Dr. Haut for a follow-up on her cognitive disorder and ADHD. Id. at 826. Dr. Haut noted that Plaintiff presented with hypomanic like behaviors and has been "over-focused on conspiracy believes about 'planet X' with decreased sleep and increased appetite." Id. at 826. Dr. Haut noted that Plaintiff was not suffering from hallucinations but "her beliefs border on delusions." Id. Dr. Haut noted that Plaintiff was very fixated on the delusions

and cannot "unplug" from them. <u>Id.</u> Dr. Haut noted Plaintiff was not acting out, had no suicidal ideation, and that her focus was "off" and had been for approximately one month. <u>Id.</u> Plaintiff appeared alert, oriented, hyper and hard to focus due to her fixed beliefs "about planetary systems and conspiracy to silence people who know about it," and her religious preoccupation. <u>Id.</u> Plaintiff was reassured that she was safe and instructed to follow up with Dr. Hines or go to the emergency department if need be. <u>Id.</u>

On May 26, 2016, Plaintiff visited Dr. Haut for a follow up on her cognitive problems and ADHD. <u>Id.</u> at 827. Plaintiff reported that she has used Benadryl since the last appointment leading to "clearer thinking" and has not had any hypomania or delusions. <u>Id.</u> Plaintiff noted that her sleep and appetite were better, and she was not over-eating. <u>Id.</u> Plaintiff noted that she almost did not come back to follow up because she was embarrassed, but ultimately decided to come. <u>Id.</u> Plaintiff appeared alert and oriented, but easily distractible. <u>Id.</u> Dr. Haut noted that she was able to refocus with cues. <u>Id.</u>

On June 6, 2016, Plaintiff visited the COAT clinic for a follow up on medication management, addiction education, and an evaluation of progress. <u>Id.</u> at 828. Plaintiff noted that she had been sober for approximately ten years and eight months, and reports that she is doing fine overall. <u>Id.</u> Plaintiff's mood has not change since her last follow up and has seemingly low energy. <u>Id.</u> Plaintiff had accidentally been taking a higher dose of Benadryl than medically necessary and Dr. Haut believed this to be the cause of paranoid thoughts which have improved upon her discontinuation. <u>Id.</u> Plaintiff reported not having the dental procedures done and her fears that are associated with such work and the re-triggering of past traumas. <u>Id.</u> Plaintiff noted that she is content waiting until "the pain is unbearable" before continuing to seek dental care. <u>Id.</u> Plaintiff noted that she has not had cravings, side effects, or withdrawal symptoms. <u>Id.</u>

On June 23, 2016, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 754. Plaintiff presented with flashbacks, intrusive thoughts, feelings of anxiety and fear, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, memory problems, nightmares, and disassociation. Id. Ms. Thomas noted fair functioning, congruent affect, good eye contact, rapid speech, and appropriate dress. Id. Plaintiff noted no suicide or homicide risk and low risk of relapse. Id. Plaintiff noted decompensated progress. Id. Ms. Thomas noted that Plaintiff shared her progress with Dr. Haut, verbalized a recent flashback, expressed her overwhelming feelings, but was able to utilize coping skills. Id.

On June 28, 2016, Plaintiff visited Dr. Haut for a follow up on her ADHD and cognitive problems. Id. at 830. Plaintiff was able to recall her last visit and some of the strategies reviewed during the visit. Id. Plaintiff presented with no depression or hypomania, alert, oriented, but hyper with the ability to calm with cues to slow her pace. Id. Plaintiff seemed motivated for treatment and noted her recovery was going very well. Id.

On August 4, 2016, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 755. Plaintiff presented with flashbacks, intrusive thoughts, feelings of anxiety of fear, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, memory problems, nightmares, and disassociation. Id. Ms. Thomas noted fair functioning, congruent affect, good eye contact, rapid speech, and appropriate dress. Id. Ms. Thomas noted no suicidal and homicidal risk, low risk of relapse, and decompensated progress. Id. Plaintiff noted that she had some fearful thoughts which related to conspiracy theories and is exhibiting paranoid thoughts. Id.

On August 4, 2016, Plaintiff visited Dr. Miller for a follow up on her anxiety and ADHD. Id. at 831. Plaintiff reported that her Ritalin is helpful and has been complaint with her Suboxone treatment and sober for approximately eleven years. Id. Plaintiff noted that her anxiety medication,

Zoloft and Buspar, help Plaintiff with her anxiety. Id. Plaintiff presented in casual dress, with a pleasant and cooperative manner. Id. Plaintiff's speech was fluent, fair to good eye contact, with a "good" mood, euthymic and stable affect. Id.

On August 11, 2016, Plaintiff visited Ms. Thomas for weekly individual therapy session. Id. at 756. Plaintiff presented with flashbacks, intrusive thoughts, feelings of anxiety or fear, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, memory problems, nightmares, disassociation, and paranoia. Id. Plaintiff noted fair functioning, congruent affect, good eye contact, rapid speech, and appropriate dress. Id. Ms. Thomas noted no suicide or homicide risk and low risk of relapse. Id. Plaintiff noted poor progress. Id. Plaintiff noted that she has theories regarding ninth planet and "fears of end times." Id.  Plaintiff noted that the serenity prayer has been effective for her anxiety. Id.

On August 14, 2016, Plaintiff visited WVU Medicine complaining an allergic reaction—a rash—chest pain, and dizziness. Id. at 759. Plaintiff was diagnosed with Urticaria and discharged. Id. Plaintiff stated that the rash had spread to all four of her extremities and itchiness. Id. at 760. Plaintiff stated that she previously took Benadryl which assisted in alleviating the itching. Id. Plaintiff noted a previous history of previous reactions and denies recent new foods or exposures. Id. Plaintiff also complains of chest tightness and shortness of breath which Plaintiff attributed to anxiety about the rash. Id. Plaintiff noted no numbness in lips, tongue or throat, and or no nausea, vomiting, or abdominal pain. Id. Plaintiff was instructed to follow up with her primary care provider in one week and Plaintiff was prescribed an EpiPen and Prednisone. Id. at 764.

On August 22, 2016, Plaintiff visited the COAT clinic for a follow up on medication management, addiction education, and an evaluation of progress. Id. at 833. Plaintiff noted being sober for ten years and eleven months. Id. Plaintiff reported doing well but is continually

suspicious of the government and worried about world events. Id. Plaintiff admitted reading government conspiracies online and this was discussed with Plaintiff. Id. Plaintiff noted the need for her to meditate more and will try to do this. Id. Plaintiff noted no cravings, side effects, and withdrawal symptoms. Id.

On August 25, 2016, Plaintiff visited Ms. Thomas for her weekly individual therapy session. Id. at 757. Plaintiff presented flashbacks, intrusive thoughts, feelings of anxiety of fear, pressured speech, racing thoughts, difficulty sleeping, difficulty concentrating, memory problems, nightmares, disassociation, and paranoia. Id. Ms. Thomas noted that Plaintiff had fair functioning, congruent affect, good eye contact, rapid speech, and appropriate dress. Id. Ms. Thomas noted no suicide or homicide risk and a low risk of relapse. Id. Ms. Thomas noted modest progress but Plaintiff "shared thoughts of the government, religion, and space." Id.

On November 10, 2016, Plaintiff visited Dr. Skidmore for a follow up on her anxiety and ADHD. Id. at 836. Plaintiff reported that her Ritalin helps her remain focus, compliant with her Suboxone, and her Zoloft prescription has helped her anxiety. Id. Plaintiff stopped her Buspar because she was "hearing weird noises in the ears." Id. Plaintiff presented in casual dress, with a pleasant and cooperative mood. Id.  Plaintiff's speech was fluent but borderline hyperverbal, in addition with fair to good eye contact. Id. Plaintiff's mood was "good" and her affect was euthymic and stable. Id.

On November 22, 2016, Plaintiff visited the COAT clinic for a follow up for medication management addiction education, and an evaluation of progress. Id. at 838. Plaintiff report being sober for eleven years and one month and doing much better about her anxiety. Id. Plaintiff admitted that her sobriety is difficult and "has learned to take things a moment at a time." Id. Plaintiff noted that she discontinued her Ritalin prescription and is currently taking Concerta. Id.

Plaintiff noted that she does not have any problems with her Suboxone prescription. Id. Plaintiff noted no cravings, side effects, nor withdrawal symptoms. Id.

On January 20, 2017, Plaintiff visited Dr. Hopkins for a follow up for her anxiety and ADHD. Id. at 840. Plaintiff reported that her Ritalin prescription continues to help Plaintiff and is compliant with her Suboxone prescription. Id. Plaintiff also reported that her Zoloft prescription continued to help with her anxiety. Id.   Plaintiff presented in casual dress with a pleasant and cooperative conversation. Id. Plaintiff's speech is fluent but borderline hyperverbal. Id. Plaintiff also presented with fair to good eye contact. Id. Dr. Hopkins noted that Plaintiff's mood is "good" with a euthymic and stable affect. Id. Plaintiff's thought process was linear, and Plaintiff was goal directed although tangential at times. Id. Dr. Vincent noted that Plaintiff had previously been switched from Ritalin to Concerta but complained of GI issues that were attributed to the change in medication. Id. at 841. Plaintiff was re-prescribed Ritalin to address her symptoms. Id.

On January 25, 2017, Plaintiff visited Wedgewood Primary Care & Psychiatry presenting with multiple skin lesions. Id. at 718. The lesions were present on her forehead, nose, lower, back, and thighs, as well as moles present. Id. Plaintiff appeared well-developed, well-nourished, and in no cardiorespiratory distress. Id.   at 720. Plaintiff appeared alert and oriented and can orient and sit comfortably on the examination table. Id. Dr. Dixon noted that the lesions are solar lentigines anterior to the chest and back, a large skin tag in the mid-back, and the left clavicular area with a .5cm rounds smooth pearly nodule. Id.

On January 31, 2017, Plaintiff visited Wedgewood Primary Care & Psychiatry complaining of chest pain that initially started one year prior. Id. at 712. Plaintiff reported an increase in frequency in the previous months. Id. Plaintiff describes the pain as "sharp in character, localized in the left lateral chest, does not radiate, and moderate in intensity. Id. Plaintiff stated that she is

not on any treatment regimen and her cardiac risk factors include poorly controlled hyperlipidemia, smoking, and a family history of CAD. Id. Plaintiff also presents for an evaluation of hyperlipidemia. Id. Plaintiff complains that she is easily fatigability, occasional chest pains, arthralgias, blurring of vision, headache, muscle weakness, myalgias, palpitations, pedal edema, and shortness of breath. Id. Plaintiff noted that she has intermittent chronic abdominal and right thigh pain. Id. Plaintiff noted that her abdominal pain stems from her ovaries and no other reason has been found. Id. Plaintiff presented as alert, oriented in time, place, and person. Id. at 714. Dr. Larkin noted that she ambulated around the examination room without assistance and sat comfortably without pain. Id. Plaintiff was cooperative with no mood swings or psychotic features and good insight, memory, and judgment. Id.

On February 7, 2017, Plaintiff was seen for a follow up by Dr. Haut to address her cognitive and depression. Id. at 842. Plaintiff presented with mild recurrent major depression, including loss of motivation, lack of interest, helplessness and hopelessness, with mild sleep and appetite disturbance. Id. Dr. Haut noted that Plaintiff could not "spontaneously recall last session," but could recognize it with cues. Id. Plaintiff appeared alert, oriented, with a flat to dysphoric affect. Id.

On February 13, 2017, Plaintiff was seen for a follow up at the COAT clinic for medication management, addiction education, and an evaluation of progress. Id. at 843. Plaintiff noted that she has been sober for eleven years and four months. Id. Plaintiff noted that she "had a rough past couple of months with depress," and had poor motivation, low energy, and guilty thoughts and isolation during Christmas time. Id. Plaintiff recently admitted to seeing her therapist who provided her strategies with coping with these feelings. Id. Plaintiff appeared "bright" and noted that she

had been doing "some physical activity." Id. Plaintiff "remains grateful for her recovery." Id. Plaintiff noted that she has had no cravings, side effects, or withdrawal symptoms. Id.

On February 22, 2017, Plaintiff visited Monongalia General Hospital for a Lexiscan Cardiolite Spec Report. Id. at 700. The scan showed "normal lexiscan perfusion study of the left ventricle with no evidence for ischemia, normal gated cine images with normal systolic function and wall thickening in all the segments of the myocardium, ejection fraction at 81%." Id.

On March 29, 2017, Ms. Thomas issued a discharge note because Plaintiff had not contacted Ms. Thomas in three months. Id. at 758. Ms. Thomas noted that Plaintiff will be permitted to schedule an appointment and restart her weekly therapy session at any time. Id.

On April 20, 2017, Plaintiff visited Dr. Haut for a follow up regarding her cognitive problems and ADHD. Id. at 845. Plaintiff noted that she has not been seen for more than two months. Id. Plaintiff reported that she can recall strategies quickly, but she does not always utilize the strategies. Id. Plaintiff reported that her depression has been resolved but is "hard on her self for [her] perceived failures." Id. Plaintiff appear alert, oriented, and hard on herself which she corrected with cues. Id. Plaintiff was able to recall the goals and strategies previously employed and could give examples of each. Id. Plaintiff does not have any delusions but is distractible by outside stimuli. Id.

On April 20, 2017, Plaintiff visited Dr. Elswick for a follow up for her anxiety and ADHD. Id. at 846. Plaintiff reported that her Ritalin helps her stay focused and decreases her hyperactivity. Id. Plaintiff reported that Zoloft helps with her anxiety and noted that while she is currently not suffering from depression, she did have a period in January 2017 in which she suffered from depression due to being overwhelmed with the things she needed to do. Id. Plaintiff reported that her current mood is a 10/10. Id. Plaintiff presented as casually dress, pleasant and cooperative

conversation, fluent speech, but borderline hyperverbal. Id. Dr. Elswick noted fair to good eye contract, "good" mood and a euthymic and stable affect. Id. Plaintiff's thought process was linear, and goal directed, yet tangential at times Id.

On May 1, 2017, Plaintiff visited the COAT clinic for a follow up for medication management, addiction education, and an evaluation of progress. Id. at 848. Plaintiff reported that she had been sober for eleven years and seven months and is doing "much better" since she had begun journaling. Id. Plaintiff noted that she has been gardening and spending more times outside. Id. Plaintiff is stable and optimistic overall and denied any problems with her medications. Id.

On May 18, 2017, Plaintiff visited Dr. Haut for a follow up for her cognitive problems. Id. at 850. Plaintiff had a poor recollection of the overall goals and strategies. Id. Dr. Haut noted that he wished to work on Plaintiff's impulsivity and how not to blurt things out. Id. Dr. Haut noted no depression and delusions, and Plaintiff has been good about following up regarding her psychiatric and addiction treatment. Id. Plaintiff appeared alert, oriented, but pretty anxious and impulsive. Id. Plaintiff could not sit down in the waiting room and was self-conscious. Id. With cues, Plaintiff was able to slow down and made a good response with impulsive control. Id. Dr. Haut reviewed Plaintiff's overall goals and specific strategies in her overall treatment. Id.

On June 22, 2017, Plaintiff visited Dr. Haut for a follow up regarding her cognition and mood but reported significant depression without psychotic symptoms or suicidal ideation. Id. at 851. Dr. Haut noted no relapse, but dysphoric and negative feelings about the world with some hopelessness. Id. Plaintiff noted that there have been no specific changes in his environment but noted that her feelings have not been well-controlled. Id. Plaintiff presented as alert, oriented, but dysphoric and a little tearful. Id. Plaintiff became more positive by the end of the session. Id.

On August 8, 2017, Plaintiff visited the COAT clinic for a follow up for medication management, addiction education, and an evaluation of progress. Id. at 852. Plaintiff noted that she was eleven years and ten months sober and has been doing very well with recovery. Id. Plaintiff noted that she is "trying to live in the moment and not get caught up with conspiracy theories and global events that are beyond her control." Id. Plaintiff noted that she needs to have six teeth pulled and continues to have infections. Id. Plaintiff noted no cravings, side effects, or withdrawal symptoms. Id.

On August 15, 2017, Plaintiff visited Dr. Haut for her outpatient treatment sessions. Id. at 854. Plaintiff was previously seen as depressed. Id. Plaintiff appeared to have "pulled self out of it" but the depression has returned, accompanied with loss of interest/pleasure, decreased motivation, disturbed sleep, appetite and feelings of hopelessness, helplessness and one very brief passing thought of suicide with no plan or intent, and over focus on conspiracy thoughts. Id. at 854. Plaintiff appeared alert, oriented, tearful with negative hopeless outlook. Id. Plaintiff made several "off-hand" comments regarding drinking to cope, but "quickly regained her recovery orientation with minimal prompts. Id. Plaintiff became "more positive with less hopelessness and no suicidal ideation and no longer tearful." Id.

On September 1, 2017, Plaintiff visited Dr. Dhar for a follow-up on her ADHD, MDD, unspecified neurocognitive disorder, and PTSD. Id. at 855. Plaintiff noted "a couple of episodes of depression" since her last appointment but noted her depressive symptoms have improved. Id. Plaintiff repeatedly noted that her Ritalin has helped with her inattention and hyperactivity and Sertraline has helped her depression. Id. Plaintiff noted no changes in her appetite or sleep. Id. Plaintiff noted that she continued to attend therapy which has been effective for her mood symptoms. Id. at 856. Plaintiff was instructed to continue her medication regimen. Id.

On September 5, 2017, Plaintiff visited the Emergency Room at WVU Ruby Memorial Hospital complaining of chest pain and shortness of breath. Id. at 778. Plaintiff complained of a cough, chest pain, and shortness of breath which began two days prior. Id. Plaintiff noted dark green sputum with cough but no other symptoms or concerns. Id.

Plaintiff visited WVU Healthcare for a Chest X-ray. Id. at 693. The X-Ray showed "no focal consolidation, no pleural effusion or pneumothorax is visible, the heart size is within normal limits, the pulmonary vasculature is unremarkable, osseous structures demonstrate no acute abnormality." Id. The X-Ray shows "no acute cardiopulmonary process." Id.

On September 13, 2017, Plaintiff visited Wedgewood Primary Care & Psychiatry. Id. at 697. Plaintiff presented for an acute visit after being seen in the ER recently for a chest x-ray that was "clear." Id. Plaintiff reported that she "is feeling about 75% better from a respiratory standpoint" but reports that her medications are making her feel sick. Id. Plaintiff requested a different prescription. Id. Plaintiff presented as cooperative, well oriented, with no mood swings or psychotic features. Id. Plaintiff had good insight with intact memory and judgment. Id. Plaintiff was instructed to return if her symptoms were worsening or not improving. Id.

On September 14, 2017, Plaintiff visited Dr. Haut for a follow up for her mood and cognition issues. Id. at 859. Plaintiff noted that she would request a female therapist so that she may address her depression. Id. Plaintiff noted that she had previously seen a therapist but ceased treatment with her. Id. Plaintiff that she is cleared of depression, has been more hopeful, and ready to refocus on her cognition. Id. Plaintiff appeared alert, oriented with a broad and appropriate affect. Id. Plaintiff noted she is a "touch sad" but excited by her progression with her attention during the session. Id. Plaintiff was referred to a female therapist and was instructed to continue working on and utilizing the strategies for her focus and cognition. Id.

On September 26, 2017, Plaintiff visited the COAT clinic for a follow up on Plaintiff's medication management, addiction education, and an evaluation of progress. Id. at 860. Plaintiff noted that she has been sober for twelve years and one month. Id. Plaintiff has established several goals which "includ[ed] practicing letting go." Id. Plaintiff was recommended to attend a program called SMART recovery which Plaintiff has received dentures but has not had the rest of her teeth pulled as previously scheduled. Id. Plaintiff noted no cravings, side effects, or withdrawal symptoms. Id.

On October 11, 2017, Plaintiff visited Brittany Walters for her recurrent major depressive disorder. Id. at 862. Plaintiff noted that she desires to work though her depressive episodes and anxiety. Id. Plaintiff explained her history of trauma, her relationship with Mr. Baker, and her abusive relationship with her son. Id. Plaintiff became visibly shaky and anxious when discussing triggers. Id. Plaintiff was instructed on certain grounding exercises and practicing mindfulness. Id. Plaintiff noted feeling safe and comfortable throughout the session and agreed to continue with a biweekly therapy session. Id. Ms. Walters noted that Plaintiff had fair eye contact, fidgety behavior, an anxious mood, and congruent to mood affect. Id.

On October 12, 2017, Plaintiff visited Dr. Haut for a follow up regarding her cognitive abilities. Id. at 865. Plaintiff's mood had improved with a better outlook and Plaintiff even recalled portions of the last session but needed some cues for specifics. Id. Plaintiff can give examples of her poor focus and would stop to correct the behavior. Id.

On November 8, 2017, Plaintiff visited Ms. Walters for her therapy sessions. Id. at 866. Plaintiff shared stories of her childhood and Ms. Walters discussed "nurturing" her inner child, challenging impulsive behaviors, and attending SMART recovery meetings. Id. Plaintiff was

provided hobbies that Plaintiff could begin to combat her SAD. Id. Plaintiff presented with fair eye contact, fidgety behavior, anxious mood, and affect which was congruent to mood. Id. at 867.

### 3. Medical Reports/Opinions

#### a. *Disability Determination at the Initial Level*

On September 1, 2015, agency reviewer Fulvio Franyutti, M.D. reviewed Plaintiff's records. Dr. Franyutti noted a history of alcoholism, seizures, and bladder problems. Dr. Franyutti noted there was insufficient medical evidence for an RFC prior to December 31, 2014. Id. at 105.

On September 1, 2015, agency reviewer Joseph Richard, Ph.D. reviewed Plaintiff's records and completed a psychiatric review technique ("PRT") assessment. Joseph Richard noted that a medically determinable impairment is present but does not precisely satisfy the diagnostic criteria. Id. at 106. Dr. Richard noted that Plaintiff has an anxiety-related disorder for recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress. Id. Dr. Richard noted that there was moderate restriction of activities of daily living; difficulties in maintaining social functioning; and difficulties maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration. Id.  Dr. Richards noted that Plaintiff has limitations of her understanding and memory; her ability to remember locations and work-like procedures is not significantly limited; her ability to understand and remember short and simple instructions is not significantly limited; and her ability to understand and remember detailed instructions is moderately limited. Id. at 107-108.

Dr. Richards noted that Plaintiff has a sustained and persistent limitations. Id. at 108. Dr. Richards noted that there is no significant limitation in her ability to carry out very short and simple instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special

supervision; ability to work in coordination with or in proximity to others without being distracted by them. Id. at 108. Dr. Richards noted that Plaintiff is moderately limited in her ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to make simple work-related decisions; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Id. at 108. Dr. Richards noted that there were social interaction limitations. Id. Specifically, Dr. Richards noted that Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and the ability to accept instructions and respond appropriately to criticism from supervisors. Id. at 108-109.

Dr. Richards noted that Plaintiff was not significantly limited in ability to ask simple questions or request assistance; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Id. at 109. Dr. Richards noted that Plaintiff had limitations in adaptions. Id. at 109. Plaintiff noted that Plaintiff has no significant limitations in her ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and take appropriate precautions; and her ability to travel in unfamiliar places or use public transportation. Id. Dr. Richards noted that Plaintiff had a moderately limited in her ability to set realistic goals or make plans independently of others. Id.

Dr. Richards noted that there is "a great deal of conflicting" medical evidence in the record about Plaintiff. Dr. Richards noted that there "are three medical sources that suggest that this claimant is not able to engage" in substantial gainful activity. Id. at 109. Dr. Richards reported that Plaintiff "was able to engage in substantial gainful activity while she was engaged in the process

of achieving her sobriety and has maintained her sobriety reportedly for seven years now and worked as recently as five years ago with no intervening event that might diminish her capabilities."

### b. *Disability Determination at the Reconsideration Level*

On January 29, 2016, agency reviewer Rogelio Lim, M.D. reviewed the prior RFC assessment and determined that Plaintiff's physical limitations were unremarkable and non-severe. (R. 126-132). Dr. Lim noted that Plaintiff alleges that she suffers from PTSD, ADHD, alcoholism, depression, anxiety, bipolar disorder, history of seizure disorder, high cholesterol, and bladder issues. Id. at 126. Plaintiff noted that she was experiencing "an increase in her anxiety levels, keeps reliving her past traumas resulting in daytime fear, anxiety, dizziness, and concentration problems, as well as nighttime sleeplessness and nightmares." Id. at 127.

On February 2, 2016, agency reviewer Joseph Shaver, Ed.D. reviewed Plaintiff's determinable mental impairments and found that Plaintiff has a medically determinable impairment, but that Plaintiff is not disabled based on the documented findings. Id. at 137.  Dr. Shaver noted that Plaintiff has a medically determinable impairment present but one that does not precisely satisfy the diagnostic criteria and anxiety-related disorder is the predominant disturbance or anxiety experienced in the attempt to master symptoms due to the "recurrent and intrusive recollections of a traumatic experience." Id. at 132. Dr. Shaver noted that there were moderate restrictions of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence or pace. Id. at 133. Dr. Shaver noted no repeated episodes of decompensation of extended duration. Id.

Plaintiff's attorney submitted the following information regarding Plaintiff's impairment:

Plaintiff's mental processing is diminished due to her childhood brain injury and PTSD. She has trouble learning new skills and thinking through problems. Her

conditions prohibit her from maintaining focus on simple tasks. Situational anxiety makes her feel uncomfortable staying in one place for long periods. She has difficulty attending to personal care and needs prompting and encouragement. Problems sleeping. Cooks once a week (Sundays) with assistance and cue cards, re-heats prepared meals throughout the week. A friend prepares her daily meds and supervises her taking them. She will sweep, clean out cat litter box and fold clothes daily using cue cards to stay on task, friend assists when available. She feeds her cat once a day. Rarely goes out. Does not driver due to overwhelming fear, can't focus, poor vision and license has not been renewed. Shops once a month accompanied by a friend. Does not know simple math, can't keep track of money, unable to pay bills, count change or handle a bank account. Motor skills affect lifting, squatting, bending, reaching, walking, kneeling, talking, hearing, seeing, using hands and stair climbing. Mental functions affect by brain injury, ADD and past trauma (memory, concentration, understanding, following instructions and getting along with others). Has been fired for fighting with co-worker. Doesn't handle stress well. Changes in routine cause panic, resists change. She has a tendency to physically rock back and forth, stealing, and picks nose when nervous. Uses shower handrails, stair railing. Uses cue cards to do housework, necessary for every day. Wears glasses."

Id. at 130.

Dr. Shaver noted that Plaintiff's individual statements regarding her symptoms is "partially credible" and "somewhat consistent with medical evidence in the record with regard to" medical evidence. Id. at 134. Dr. Shaver noted that the physical impairments are non-severe. Id. Dr. Shaver noted that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures; ability to understand and remember very short and simple instructions; ability to carry out very short and simple instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; and ability to work in coordination with or in proximity to others without being distracted by them. Id. at 135. Dr. Shaver noted that Plaintiff was moderately limited in her ability to understand and remember detailed instructions; her ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to make simple work-related decisions; and ability to complete a normal workday

and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Id. at 134-135.

Dr. Shaver noted that Plaintiff was not significantly limited in her ability to ask simple questions or request assistance; ability to get along with coworkers or peers without distracting them or exhibiting behavioral extreme; and ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. Id. at 135. Dr. Shaver noted that Plaintiff was moderately limited in her ability to interact appropriately with the general public and her ability to accept instructions and respond appropriately to criticism from supervisors. Id. at 135. Dr. Shaver noted that Plaintiff was not significantly limited in her ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and take appropriate precautions; and ability to travel in unfamiliar places or use public transportation. Id. at 136. Dr. Shaver noted that Plaintiff was moderately limited in her ability to set realistic goal or make plans independently of others. Id.

Dr. Shaver noted that Plaintiff's statements are somewhat consistent with the medical evidence in the record but "there is a great deal of conflicting medical evidence in the record with regard to this claimant." Id. at 136. Dr. Shaver noted that:

> There are three medical sources that suggest that this claimant is not able to engage in substantial gainful activity. Yet, the claimant was able to engage in substantial gainful activity while she was engaged in the process of achieving her sobriety and has maintained her sobriety reportedly for seven years now and worked as recently as five years ago with no intervening even that might diminish her capabilities. Actually, reports suggest an improvement in her abilities since last being employed.
>
> Also, one medical source opinion suggests that an early childhood TBI influences her cognitive abilities, yet the claimant has completed High School and 2.5 years of college.
>
> Again, the claimant has improved in her capabilities since becoming sober and was able to engage in substantial gainful activity prior to becoming sober and as a result does appear to have the residual functional capacity to complete work-like activity

in a low stress work environment, on simple routine tasks, with no production requirement, with minimal contact with the public and makes accommodations for any physical limitations.

Id. at 136.

### c.   Written Medical Opinions

On January 8, 2018, Dr. Haut authored a noted to Dr. Henning regarding Plaintiff's social security application. Id. at 868. Dr. Haut noted that he has been Plaintiff's provider since 2014 when he began treating her for her cognitive rehabilitation after previously evaluating her in 2011. Id. Dr. Haut noted that he believes Plaintiff meets the Major Neurocognitive disorder criteria secondary to a traumatic brain injury that results in impaired attention and front/executive dysfunction. Id. Dr. Haut noted that he believes these deficits to be stable, unchanged, and unlikely to change proceeding forward. Id. Dr. Haut noted that he believed these symptoms to have been present since childhood and cause a significant limitation in Plaintiff's "functional status with marked problems maintaining persistence and pace in getting tasks completed." Id. at 868. Dr. Haut noted that it takes whole days to complete basic household tasks due to her extreme distractibility. Id. Dr. Haut also noted that Plaintiff had marked problems managing herself and her emotions. Id. Plaintiff is extremely uncomfortable arounds others and although she has made some recovery, Dr. Haut believes that these deficits will continue to have a marked impact on her life. Id.

On February 19, 2015, Holly Thomas, MSW, LICSW, AADC, which documented Plaintiff's treatment by Ms. Thomas. Ms. Thomas noted that Plaintiff was diagnosed with post-traumatic stress disorder and attention deficit/hyperactivity disorder, including "intrusive thoughts, avoidance, flashbacks, loss of time, memory problems, severe feelings of anxiety/fear/panic, worried thoughts, communication problems, relationship problems, poor concentration, feelings

of restlessness, being easily distracted, flight of ideas, and difficulty sustaining attention. Ms. Thomas noted that Plaintiff's symptoms significantly impact her day and social interactions and is seeking treatment is focused on "processing trauma, identifying and verbalizing triggers, improving social interactions, reducing and managing symptoms, coping skills, and improving day to day functioning." Id. at 444.

On February 19, 2015, Dr. Benjamin Douglass Hines, authored a note on behalf of Plaintiff regarding her social security disability application. Id. at 446. Dr. Hines noted that Plaintiff struggles with cognitive day to day activities and has difficulty staying on task for long periods of time. Dr. Hines noted that Plaintiff has a history of traumatic brain injury which continues to affect her cognitive abilities. Dr. Hines noted that Plaintiff was diagnosed with ADHD and PTSD. Plaintiff is often anxious and hypervigilant.  Plaintiff requires "frequent reassurances," Dr. Hines noted that despite counseling and medications, she struggles and will not likely improve. Id.

On February 20, 2015, James H. Berry, D.O., authored a note regarding Plaintiff's care as her addiction psychiatrist. Dr. Berry noted that Plaintiff has made "significant strides in maintaining sobriety and living a life of recovery." Dr. Berry noted that Plaintiff "is no longer a slave to her addiction and has demonstrated remarkable courage and resilience in facing her demons. Over the course of seven years, I have watched a woman who was barely able to carry on a conversation due to crippling fear and anxiety, grow into a woman who has found her own voice." Id. at 451. Dr. Berry also noted that Plaintiff has been compliant with her treatment recommendations. Id.

On May 12, 2014, Dr. Marc Haut, PhD. authored a letter regarding Plaintiff's application for social security. Dr. Haut noted that he believed that Plaintiff's condition met the 12.02 listing for an Organic Mental Disorder based on his outpatient treatment of her. Plaintiff has severely

impaired cognitive flexibility and response inhibition and problems with preservation with problem solving. Dr. Haut noted that Plaintiff needed assistance with bills and medication; is "painfully shy;" and has "constant problems with attention, persistence and pace." Id. at 447.

On March 1, 2011, Dr. Marc Haut noted that that Plaintiff report difficult with concentration which affected her ability to be on time, difficulty listening, and misplacing or losing items. Plaintiff reported that she was distracted, fidgety, and had difficulty sitting still. Plaintiff also reported being impulsive and interrupted people. Plaintiff has difficulty reading and reading comprehension. Plaintiff reported that she suffered from seizures, which were subsequently treated with phenobarbital and Dilantin. Plaintiff also noted that she is prescribed Celexa an Suboxone. Dr. Haut concluded that Plaintiff demonstrated "significant cognitive deficits;" exhibiting "difficulty with her attention and processing, as well as other significant front lobe dysfunction;" "preservation, impaired problem solving, problems with cognitive flexibility and significant difficulty with response inhibition." Id. at 449. Dr. Haut noted that the pattern of effects "fits with adult residual ADHD," he "believe[s] the etiology is more likely related to her significant head injury as a child." Id. at 449.

Dr. Haut noted that Plaintiff was notably late for the examination and was nervous, anxious, and self-conscious. Id. at 450. Plaintiff appeared restless, fidgety, and used self-deprecating comments. Plaintiff was impulsive and responded before the instructions were completed. Plaintiff often repeated to herself what had previously be stated to her and worked slower than typical. Id. Dr. Haut noted that the neuropsychological evaluation revealed that Plaintiff showed significant cognitive deficits, difficulty with her attention and progressing, and significant front lobe dysfunction. Id. at 449. "Plaintiff has preservation, impaired problem solving, problems with cognitive flexibility and significant difficulty with response inhibition." Id. Dr. Haut noted that he

understands why going back to school would be a struggle for her given her disorganization, slowed processing, and attention problems. Id.

## C.    Testimonial Evidence

At the ALJ hearing held on January 18, 2018, Plaintiff testified that she is single with two children, ages 22 and 32. R. at 50.  Plaintiff testified that she received a high school diploma and had "on-the-job training" after her schooling. Id. at 55-56. Plaintiff also testified that she took a class that was approximately three to six weeks that taught her American Sign Language. Id. at 56. Plaintiff testified that she also took a first aid course. Id. at 57. Plaintiff also testified that she took a class to learn to read blueprints but did not actually learn to read blueprints. Id. at 57. Plaintiff testified that she attended Chaffey Junior College, California, for two credits—English and General Education. Id. at 58. Plaintiff also attended Mount SAC Junior College for one semester and West Virginia University for one semester. Id. at 58. Plaintiff testified that she currently receives food stamps and medical assistance. Id. Plaintiff testified that she receives Worker's Compensation for an injury—concussion—that she received on the job. Id. Plaintiff testified that she currently does not receive unemployment benefits. Id. at 60.

Plaintiff testified that she as a fulltime hostess for Bob Evans. Id. at 66. Plaintiff testified that she that she does not remember how long she worked there but estimates that she was employed for at least a year. Id. Plaintiff testified that she also had a position delivering auto parts to different companies and stores. Id. at 65. Plaintiff was employed full time for over a year. Id. Plaintiff testified that she had next worked at REM as a counselor who protected and assisted her clients during seizures and to obtain medical assistance if necessary. Id. at 61. Plaintiff also testified that she would tidy up, including dishes, vacuuming, cleaning the bathroom. Id. Plaintiff testified that she has been disabled since leaving her position. Id. at 62. Plaintiff testified that she

left her position after being assaulted by a fellow employee. Id. at 63. Plaintiff testified that she looked for other positions at gas stations and other counseling jobs. Id. at 64.

Plaintiff further testified that her physical and mental conditions interferes with her focus the most. Id.at 67. Plaintiff testified that she is prescribed Zoloft, Ritalin, and Suboxone. Id. at 68. Plaintiff testified that she is taking Zoloft for her bipolar disorder, depression, and anxiety. Id. Plaintiff stated that her prescriptions make her drowsy, with dry mouth, and a headache. Id. Plaintiff testified that she attends meetings "from time to time." Id. at 68.

At the hearing, Plaintiff testified that Plaintiff testified that she stopped attending her appointments with Ms. Thomas because she felt like she was being graded so she stopped in 2017. Id. at 75. Plaintiff testified that she has since started seeing Brittany Walters, a new therapist. Id. Plaintiff testified that the therapy has been helping her and that "it's a process." Id. at 76. Plaintiff testified that uses cue cards that were provided by Dr. Howell that allow her to navigate through the day, and specifically testified regarding on which stated, "slow and steady wins the race." Id. at 79-80.

Plaintiff also testified regarding her daily activities. Plaintiff testified that her friend, Ed Baker, helps her with her "life choices." Id. at 51. Plaintiff testified that Mr. Baker has taken her to see her son, to her doctor appointments, and to the grocery store. Id. at 53. Plaintiff testified that she goes shopping once a month, does dishes every other day, does laundry once a week, and vacuums once every two weeks. Id. at 72. Plaintiff testified that she also cleans the bathroom and cleans the litter box. Id. Plaintiff testified that she previously had a driver's license, but it expired in 2013. Id. at 53. Plaintiff relinquished the driver's license to the DMV in order to obtain an identification card but had not driven since 2013. Id. at 54. Plaintiff also referred to Mr. Baker as

her common law significant other. Id. at 53. Plaintiff noted that she does Mr. Baker's laundry, picks up after him, and cooks meals that he can eat. Id. at 55.

Plaintiff testified that she colors, attempts to journal daily, watches television, and meditates. Id. at 74. Plaintiff testified on a daily basis, that she wakes up at approximately 6:00 AM and drink milk and takes her medicine (which Mr. Baker helps her consume). Id. at 77. Plaintiff testified that when she does cook, she either cooks burritos or spaghetti, of which she sometimes loses track. Id. at 78. Plaintiff testified that when she does the dishes, she will attempt to do them in one session, but often takes breaks lasting anywhere from a minute to a day. Id. Plaintiff testified that she often forgets about the laundry that's in the washer or dryer. Id. Plaintiff testified that the week prior to the ALJ hearing, she forgot her laundry in the washer for a whole week. Id. Plaintiff testified that while she does not need assistance in the shower, Mr. Baker must be home in order for her to shower because otherwise she will not shower. Id. at 80. Plaintiff testified that Mr. Baker takes her to the market and needs her list which she makes with the assistance of Mr. Baker. Id. at 81-82. Plaintiff testified that she needs to breathe once she gets out of the car and she has trouble being calm, staying focused, staying on task, not panicking, and breathing. Id. at 81.

At the ALJ hearing on May 17, 2018, Plaintiff testified regarding her daily activities. Id. at 89. Plaintiff testified that she wakes up at 6:00 AM in the morning, uses the bathroom, and take her medication. Id. Plaintiff testifies that she goes back to sleep until approximately 10:30 or 11:00 AM. Id. Plaintiff testified that she gets up, gets dressed, brushed her teeth, and feeds her cat. Id. Plaintiff testified that she will draw or color, play with her cat, and pick up things around the house during the day. Id. Plaintiff testified that she cleans her apartment by washing the dishes and cleaning the cat's litter box. Id. at 90. Plaintiff testified that she cooks meals for herself on Sunday,

which consist of burritos or spaghetti. Id. Plaintiff testified that she leaves her house every three to four weeks for her doctor's appointments and once a month to go to the market. Id.

Plaintiff testified that she is afraid of leaving her house because she thinks that someone will "get" her or hurt her. Id. at 91. Plaintiff testified that she goes to bed at 9:00 PM. Id. at 92. Plaintiff testified that there are days where she feels sluggish but usually always gets out of bed. Id. Plaintiff testified that Mr. Baker calls them her "gloom and doom days." Id. Plaintiff stated it's like "the world's going to end or how bad the world is and how bad people are to each other, and the wars and stuff, sometimes that gets me down." Id. at 93. Plaintiff testified that this occurs approximately once or twice a week. Id. Plaintiff testified that during these days "it gets heavy" and she cries, and it is hard to stop crying. Id. at 94.

**D.    Vocational Evidence**

During the May 17, 2018 hearing, Mr. Larry Bell, a vocational specialist testified. Mr. Bell characterized Plaintiff's past work as

> A:    She did work as she describes it, a Counselor would be under Home Health Aide; medium, semi-skilled, SVP 4; the DOT number's 292.353-010, but as performed, she had indicated that the heaviest weight was ten pounds, so it would've been light as performed. Then her work as a, did you want the waitress—
> Q:     It was a—
> A:     --and Greeter?
> Q:     --a Hostess position
> . . .
> A:     Oh, Hostess. Okay, her work as a Hostess is light, skilled, SVP 6, 310.137-010.

R. at 95-96.

The ALJ then asked the following hypothetical:

> Q:     Mr. Bell, assume a hypothetical individual of the same age, education and work experiences as the Claimant, who retains the capacity to perform medium work; must avoid all exposure to unprotected heights, hazardous machinery and commercial driving; whose work is limited to simple and routine and repetitive tasks; requiring only simple decisions; with no fast-

61

paced production requirements and few work workplace changes; who is to have no interaction with the public and only occasional integration with coworkers and supervisors. Are there jobs in the national economy that such an individual could perform?

A:    I guess not. It could very well be that I could find that an individual could function as a Kitchen Helper; medium, unskilled, SVP 2, 250,000 nationally, 318.687-010. Or as a Laundry Worker; medium, unskilled, SVP 2, 200,000 nationally, 361.684-014.

Q:    Regarding tolerances, what are the customary tolerances that a typical employer would have as to an employee being late to work or having unexcused or unscheduled absences, and if that were exceeded, what would the result be?

A:    I know if an employee reaches the level of missing two or more days per month, I believe the supervisory person would attempt an intervention to correct that, and if the intervention proved to be unsuccessful, it would result in termination, I believe.

Q:    What are the customary number of lengths of breaks that a typical employee could miss during the work day?

A:    There'd be a 15 minute break in the morning and in the afternoon, and have 30-60 at lunch, depending on the work site.

Q:    What are the customary tolerances for how much time during an eight hour work day a typical employer would permit that employee to be off-task, in addition to regularly scheduled breaks, and if that were exceeded, what would the result be?

A:    If an employee reaches a level of being off-task 10% or more of the time, I believe that would completely eliminate a competitive work routine at any level, including the jobs that I provided in response to your hypotheticals.

Q:    Has all your testimony today been consistent with and according to your experience and the DOT?

A:    Yes, Your Honor, I believe it is.

R. at 96-98.

**E.**    **Report of Contact Forms or Disability Reports**

On April 28, 2015, M. Humphries completed a Disability Report for Plaintiff regarding her alleged impairments. Id. at 324. Humphries noted that she observed Plaintiff was having difficulty talking and answering questions, but had no difficulty hearing, reading, breathing, understanding, coherency, concentrating, sitting, standing, walking, seeing, using hands, or writing. Id. at 325. Humphries noted that Plaintiff appeared on time for the interviews, with appropriate grooming and hygiene, and did not have any difficulty proving information or answering questions. Id. at 326. Humphries noted that Plaintiff seemed nervous and somewhat anxious as well as expressing concern that she was being videotaped. Id. Plaintiff noted that she can speak, read, write, and understand English. Id. at 327. Plaintiff noted that she stopped working on January 1, 2010 due to her condition. Id. at 328.

Plaintiff noted that she is treated by Holly Thomas for her PTSD, depression, and anxiety related issues. Id. at 332. Plaintiff noted that she is also treated by Wedgewood Family Practice as her primary care provider for her high cholesterol and bladder issues. Id. Plaintiff noted that she is seen by Drs. Berry and Hines who are psychiatrists who are working with her to address her recovery, PTSD, ADHD, bipolar disorder, depression, and anxiety; as well as Dr. Haut who monitors her seizures. Id. at 332.

On October 29, 2015, T. Nice completed a Disability Report for Plaintiff regarding her alleged impairments. Id. at 369. Nice noted that Plaintiff's name is Nancy Lea Nutt, born female on January 21, 1963, with an alleged onset date of January 1, 2010. Id. at 367. Nice noted that she had no contact with Plaintiff. Id. at 368.

On April 5, 2016, Representative Jordan Smith completed Disability Report on behalf of Plaintiff regarding her alleged impairments was completed. Id. at 392. Plaintiff noted that she lives with her friend Eddie Barker. Id. at 392. Plaintiff noted that her condition has not changed since

she last informed the Administration of her conditions. Id. Plaintiff noted that there were no new medical conditions that have developed. Id. at 393. Plaintiff noted that she does not have any future medical appointments, is not taking any currently prescribed medication, and there is no additional medical information to provide. Id.

On August 27, 2015, a consultation examination was performed on Plaintiff by Dr. Russell Biundo. Id. at 664-670. Plaintiff noted that she is allergic to Phenergan and is currently prescribed Zoloft, Suboxone, Ritalin, Aspirin, and Vitamin D. Id. at 665. Dr. Biundo assessed that Plaintiff had PTSD, anxiety, depression, opioid dependence, and appear anxious but with no other major abnormal physical issues. Id. at 667. Dr. Biundo assessed Plaintiff's full range of motion. Id. Dr. Biundo noted that Plaintiff can fully extend her hand, make a fist, and her fingers can be opposed. Id. at 668. Dr. Biundo noted that Plaintiff's upper extremity and grip strength were5/5, with normal fine manipulation. Id. at 669. Dr. Biundo noted that Plaintiff had a 5/5 for left and right lower extremity strength and made a good effort. Id.

On February 5, 2018, Edward Baker, Ph.D., completed a disability determination of Plaintiff regarding her mental status and completed a clinic interview. Id. 878. Plaintiff appeared with fair hygiene, cooperative, meek, and somewhat confused and nervous. Id. Plaintiff answered all of the psychologist's questions. Id. Plaintiff noted that she had difficulty with focusing and concentration, as well as PTSD from an abusive childhood. Id. at 879. Plaintiff also noted that she had ADHD, depression, anxiety, and bipolar disorder, as well as being a recovering alcoholic. Id. Plaintiff has a history of seizures but has not had a seizure in the preceding five years. Id.

Plaintiff complained of pain in her neck. Id. Plaintiff stated that she feels rested, takes naps when she needs to, and has a fair appetite. Id. Plaintiff noted that she has crying spells once or twice a week and "it changes—lately it has been bad." Id. Plaintiff stated that she had low energy,

anxiety and PTSD-related symptoms, but no suicidal thoughts. Id. Dr. Baker noted that Plaintiff attempted suicide in 1998 but denied any recent suicidal ideation. Id. at 880. Plaintiff is prescribed Suboxone, aspirin, and Vitamin D. Id. Dr. Baker noted that Plaintiff's prognosis is "guarded," but that Plaintiff can manage her disability benefits on her own. Id.

Dr. Baker also completed a Medical Source Statement regarding Plaintiff's abilities to do work-related activities. Id. at 882. Dr. Baker noted that Plaintiff had no effect on her understanding and remembering simple instructions; carrying out simple instructions; ability to make judgments on simple work-related decisions; understand and remember complex instructions; and ability to make judgments on complex work-related decisions; but had a mild limitation on Plaintiff's ability to carry out complex instructions. Id. Dr. Baker noted that Plaintiff "appears to have mild impairment regarding complex tasks due to her difficulties with concentration on occasion. Id. Plaintiff noted that there is no limitation of Plaintiff to interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting, affected by impairments. Id. at 883. Dr. Baker noted that Plaintiff is not affected in her other capabilities and noted that "she was able to work at REM, 4-5 years ago, she has a support system and treatment team to assist her when she is not functioning well." Id.

**F.  Lifestyle Evidence**

On an adult function report dated May 7, 2015, Plaintiff stated that she has a significant inability to concentrate, to recall, information processing, short term memory and memory lapses, and planning. Id. at 336. Plaintiff alleges that she wakes up early in the morning, takes her medications, and goes back to bed until 11:00 AM. Id. Plaintiff noted that she makes toast and takes her noon medication, folds laundry, cleans her cat's litter box, art projects, watches tv, and naps. Id. Plaintiff noted that she takes her evening medication, takes a shower, and watches

television until bedtime. Id. at 344. Plaintiff noted that she goes to bed at 10:00 PM. Id. Plaintiff noted that she takes care of her grown son who is a student and does laundry, sweeps, fold clothes, and sometimes does dishes. Id. at 336. Plaintiff noted that she takes care of her cat and her son helps her feed and give the water the cat. Id. When asked what Plaintiff was able to do before her condition, Plaintiff responded "I have never known a time when I was before." Id. at 338. Plaintiff noted that she has difficulty falling asleep and staying asleep. Id. Plaintiff noted that as far as personal care, she never knows what to wear; her shoes come untied; can only wear certain things; experiences fear in the shower; she sometimes has to wait for people to get home to shower; she never shaves because it's too hard and she cuts herself; she only eats soft food and no meat; and noted some bladder issues. Id. at 338. Plaintiff noted that she needs reminders to shower because she talks herself out of it or gets sidetracked. Id. at 339. Plaintiff noted that her significant other reminds her to take her medication. Id. Plaintiff noted that she only makes cereal, Ramin, soups, toast, Eggos, peanut butter and banana sandwiches. Id.

Plaintiff noted that she does not cook on top of the stove anymore because she forgets and catches things on fire. Id. Plaintiff noted that she does the laundry and sweeps the kitchen and bathroom floor. Id. Plaintiff noted that she needs help bringing the laundry up the stairs because she trips. Id. Plaintiff noted that yard work is overwhelming and noted that she gets hurt. Id. at 339. Plaintiff noted that she only goes outside two or three times a week because its hot. Id. Plaintiff noted that she does not drive because she gets dizzy. Id. Plaintiff noted that she can only add and subtract some and always gets her answers wrong. Id. Plaintiff noted that she only learned to count change in the twelfth grade and had previously been in trouble with the bank because she cannot budget her money. Id. Plaintiff noted that she loves to color, draw, watch television and

movies, but not the commercials. Id. Plaintiff noted that she has always been this way, but that it is just magnified and hard. Id. at 341.

Plaintiff noted that she leaves her house for doctor's appointments and therapy and needs someone to take her and wait for her appointment to finish. Id. at 341. Plaintiff noted that her ex-in laws "hated her" and claimed that she was too stupid to raise her son and that her neighbors don't talk to her much. Id. Plaintiff noted that she has difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, talking, stair climbing, seeing, memory, completing tasks, concentrating, understanding, following instructions, and getting along with others. Id. at 342. Plaintiff noted that she can walk for approximately fifty feet and then take a five to ten minute rest. Id. Plaintiff noted that she can pay attention for approximately one minute and cannot follow written instructions. Id. Plaintiff noted that she tries hard to follow spoken instructions. Id. Plaintiff noted that she does not handle stress well and goes to her "special place" in her head, which is the ocean, to handle it. Id. Plaintiff noted that she keeps her routine and does not change it. Id. Plaintiff noted that she rocks back and forth or picks her nose when she is stressed. Id.

On an adult function report dated November 19, 2015, Plaintiff stated that her "conditions prohibit her from maintaining focus on simple tasks. Furthermore, her mental processing is diminished due to her childhood brain injury and PTSD. [She] has trouble learning new skills and thinking through problems. Also, situational anxiety makes [her] feel uncomfortable staying in one place for long periods." Id. at 378. Plaintiff described her daily activities as: "wake up, take medicine. Go back to sleep until approximately 11am, then eat. From lunch to dinner—watch tv intermittently, clean, feed pet, take meds again, and practice therapeutic breathing. After dinner, household chores and walks." Id. at 379. Plaintiff noted that she does not care for anyone but

herself and her cat. Id. at 379. Plaintiff noted that her friend assists in buying the cat food and delivers the food to her house." Id.

Plaintiff noted that she was injured in her childhood that have caused her lifelong problems. Id. at 379. Plaintiff noted that she has night terrors, sleeplessness, and racing thoughts before bedtime. Id. Plaintiff noted that she frequently wakes up during the night. Id. Plaintiff noted that it takes her approximately one to three hours to get dressed, someone must be in the home when she bathes, extremely limited in feeding herself, is anxious to use the toilet, and is not sexually active due to intimacy issues. Id. Plaintiff noted that she needs prompting from others, encouragement from friends, and assistance from others in preparing and supervising her medication consumption. Id. Plaintiff noted that she cooks weekly, on Sundays, and she prepares cereal, spaghetti sauce, burritos, crock pot meals, and stews. Id. at 380. Plaintiff noted that it takes approximately three hours, but Plaintiff must have assistance and use her cue cards. Id.

Plaintiff noted that she sweeps, cleans out her cat's litter box, and folds clothes for approximately two to three hours per day. Id. Plaintiff testified that she utilizes her cue cards whenever necessary and her friends assist her when they are available. Id. Plaintiff noted that she does not do house or yard work because she is not physically able to and she is scared to be out in the open. Id. at 381. Plaintiff noted that she rarely goes outside due to her anxiety and fear, but will take brisk walks, attends doctors' appointments, and sometimes shops with friends. Id. Plaintiff noted that she will ride in a car but will not go out alone because she has anxiety and trouble focusing. Id. Plaintiff noted her "overwhelming fear" of driving and she has not renewed her license due to fear and poor vision. Id. Plaintiff noted that she goes to the groceries and thrift store once a month for approximately two hours. Id. Plaintiff noted that she cannot pay bills, count change, handle a savings account, or balance a checkbook. Id.

Plaintiff noted that she does not know simple math and cannot keep track of money. Id. Plaintiff noted that she loses focus and needs someone to help her. Id. Plaintiff noted that her hobbies include art, brushing her cat, and playing hide and seek with her cat which she does daily. Id. at 382. Plaintiff that she has short interval conversations and does not visit or communicate with others frequently. Id. Plaintiff noted that she has problems getting along with others due to her anxiety, fear, and panic; she noted that her neighbors think she is crazy. Id. Plaintiff noted that she does not have a social life due to other lifelong problems. Id. Plaintiff noted that her conditions affect her: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentration, understanding, follow instructions, using hands, and getting along with others. Id. at 383.

Plaintiff noted that she lacks balance and coordination and is unsure of her ability. Id. Plaintiff noted that she could walk approximately forty to fifty yards and needs a five to ten minute rest. Id. Plaintiff noted that she can pay attention for only a few minutes and cannot follow written instructions at all. Id. Plaintiff noted that she can follow simple instructions but cannot follow complex instructions. Id. Plaintiff noted that she was previously fired for fighting with her co-worker and was physically assaulted at her previously employment at R.E.M. Id. at 384. Plaintiff noted that she does not handle stress well, panics, resists change, and "has had the same routine ever since she can remember." Id. Plaintiff noted that she has tendency to physically rock back and forth, stealing, and picks her nose when she is nervous. Id. Plaintiff utilizes shower handrails, stair railing, and cue cards to do housework. Id. at 384.

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since January 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416. 971 *et seq.*).

3. The claimant has the following sever impairments: sprains and strains; major depressive disorder; anxiety; bipolar disorder; post-traumatic stress disorder ("PTSD"); attention deficient hyperactive disorder ("ADHD")/ADHD secondary to history of traumatic brain injury; cognitive disorder/neurocognitive disorder; mood disorder; and opioid dependence depression (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) (i.e. is able to occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; and stand and/or walk, with normal breaks, for a total of about 6 hours in an8-hour workday), except the claimant must avoid all exposure to unprotected heights, hazardous machinery, and commercial driving; is limited to simple, routine, and repetitive tasks, requiring only simple decisions, with no fast-paced production requirements, and few work place changes; and is capable of occasional interaction with co-workers and supervisors and no interaction with the general public.

6. The claimant is unable to perform any past relevant work (20 CFR 404-1565 and 416.965),

7. The claimant was born on January 21, 1963 and was 46 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.96).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

> 11.    The claimant has not been under a disability, as defined in the Social
>        Security Act, from January 1, 2010, through the date of this decision (20
>        CFR 4041520(g) and 416.920(g)).

(R. 15-28).

# VI.    DISCUSSION

## A.    Standard of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).

However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

"[Reviewing] courts are not to try the case de novo. At the same time, they must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole

to determine whether the conclusions reached are rational." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474 (1951); <u>Thomas v. Celebrezze</u>, 331 F.2d 541 (4th Cir. 1964). As such, "[reviewing courts] do not reflexively rubber-stamp an ALJ's findings." <u>Lewis v. Berryhill</u>, 858 F.3d 858, 870 (4th Cir. 2017). There are some things an ALJ must do in reaching and explaining his decision. An ALJ has a basic duty of explanation; his decision must be sufficiently explained to permit a court to meaningfully review it. <u>Radford v. Colvin</u>, 734 F.3d 288, 295-95 (4th Cir. 2013).

An ALJ must also "explicitly indicate[] the weight given to all of the relevant evidence." <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984). An ALJ must provide an "accurate and logical bridge" from the evidence to his conclusion. <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016). There are also some things an ALJ may not do in reaching a decision. An ALJ may not selectively "cherrypick facts that support [his decision] while ignoring relevant evidence [to the contrary]." <u>Lewis</u>, 858 F.3d at 869. Moreover, while an ALJ is not required to discuss every piece of evidence, <u>Reid v. Commissioner</u>, 769 F.3d 861, 865 (4th Cir. 2014), an ALJ excludes relevant evidence at his peril.

## B.     Contention of the Parties

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is based upon an error of law and is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff alleges that:

1.     The ALJ erred by not according Plaintiff's treating physicians with the proper weight.

2.     The ALJ erred by finding that Plaintiff did not meet the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1, when substantial evidence does not support that finding.

       3.     The ALJ erred in presenting an inaccurate hypothetical to the vocational expert. (Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at [1], ECF No. 15). Plaintiff asks the Court to "remand the case to the Commissioner with instructions to issue a new decision based on substantial evidence and proper legal standards." (Id. at 16).

       Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at [16]). Specifically, Defendant alleges that:

1. The ALJ's decision was based on substantial evidence in consideration of the medical opinion evidence.

2. The ALJ's decision at Step Three was support by substantial evidence and correctly concluded that Plaintiff does not meet or equals the requirements of Listing 12.02.

3. The ALJ's decision at Step Five was made based on substantial evidence.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br."), ECF No. 17).

**C.    Analysis of the Administrative Law Judge's Decision**

    **1.  The ALJ did not err by according less weight to Plaintiff's treating physician's opinions.**

       Plaintiff first challenges the ALJ's weight given to Plaintiff's treating physicians and argued that the ALJ erroneously failed to provide their opinions with controlling weight. The ALJ specifically accorded each of Plaintiff's treating physician's opinion's "little weight." However, the ALJ did properly explained as required under the law to explain the reason for the discount.

       In consideration of the determination of whether an individual is "disabled," all medical opinions are considered "together with the rest of the relevant evidence." 20 C.F.R. § 416.927. More weight is generally given to the opinion of a doctor who has examined the patient rather than just reviewed medical records to make the determination. Id. Furthermore, treating sources are

given more weight "since their sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained form the objective medical findings alone or from reports of individual examinations. Id. A "treating source" is defined as claimant's "own acceptable medical source who provides [claimant], or has provided [claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with" claimant."

A treating physician's opinion will be given <u>controlling</u> weight when "the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is *not inconsistent with the other substantial evidence* in [the] case record." <u>Craig v. Chater</u>, 76 F,3d 585 (4th Cir. 1996). A medical opinion is an opinion "about the nature and severity of an individual's impairment(s) and are the only opinions that may be entitled to controlling weight." <u>Social Security Ruling 96-2</u> (rescinded effective March 2017)[3]. In the event, "a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." <u>Mastro v. Apfel</u>, 270 F.3d 171, 178 (4th Cir. 2001). In these circumstances, an ALJ must give "less weight" to the treating physician's opinion because it is an error to give controlling weight in that circumstance. <u>Id.</u>; <u>Social Security Ruling</u> 96-2p.

> Whether a medical opinion is "not consistent" with the other substantial evidence is a judgment that adjudicators must make in each case. Sometimes there will be an obvious inconsistency between the opinion and the other substantial evidence; for example, . . . when two medical sources provide inconsistent medical opinions about the same issue.

---

[3] As Plaintiff's claim was filed prior to the rescission of the "treating physician's rule," Plaintiff's treating physician's opinion will be considered controlling unless the "opinion[s are] not supported by clinical evidence or if it is inconsistent with other substantial evidence."

Social Security Ruling 966-2p. This does not mean that the treating source's opinion is completely rejected. Id. These sources' opinions are given deference and are subject to the factors found in 20 C.F.R. § 404.1527 and 416.927.

In an event that "controlling weight" is not given to a certain medical source, the ALJ must consider the following factors:

1.  The length of the treatment relationship and the frequency of examination;

2.  The nature and extent of the treatment relationship;

3.  Supportability;

4.  Consistency;

5.  Specialization; and,

6.  Other factors, including "any factors [claimant] or others brings to [the ALJ's] attention, or of which [the ALJ is] aware, which tend to support or contradict the medical opinion."

20 C.F.R. §§ 416.927. The Commissioner is required to present "good reasons" as to the determination or decision regarding the weight of the treating sources opinion. 20 C.F.R. § 416.927. These must be "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Social Security Ruling 96-2p.

### i.  Medical Opinions

The ALJ did not give controlling weight to Plaintiff's treating medial opinions but provided an adequate explanation and reasoning as to why the ALJ discounted those opinions. Plaintiff's argument—that the ALJ substituted his own judgment and evaluations for that of medical

professionals—is unfounded. The ALJ provided a lengthy explanation for his determination and each prong required was evaluated and the ALJ established reasoning for each.

First, the ALJ discount Dr. Haut's May 2014 and January 2018 opinions in which Dr. Haut noted that Plaintiff meets the criteria for a Major Neurocognitive Disorder with noted limitations such as maintaining persistence and pace, getting "stuck and is inflexible with tasks," being uncomfortable around others, and that these deficits are unlikely to change over time. R. at 868. Dr. Haut also noted that Plaintiff meets the listing for Organic Mental Disorder and has impaired cognitive flexibility and response inhibition, and severe problems with perseveration with problem solving. Id. at 447. The ALJ discounted these opinions, specifically noting that while this opinion provides specific limitations that Plaintiff has, the opinion is unsupported by the doctor's own medical treatment and inconsistent with the whole record. Specifically, the ALJ noted that Plaintiff sought:

> Only routine treatment, with clear evidence of improvement/stabilization of her symptoms; she has not more than moderately abnormal mental status examination findings and no more than moderate to transient GAF scores; and the record is rife with notations in the treatment notes that support activities of daily living and work like activities which are entirely inconsistent with any marked limitation.

R. at 25.

Second, the ALJ discounted Dr. Douglas Hines medical source statement and gave it little weight because the medical source statement only provided information regarding her diagnoses and that she had struggled with jobs in the past but did not provide information on her functional limitations. Furthermore, the ALJ discounted the opinion based on the fact that Plaintiff's treatment was routine, and his own notes indicate improvement and stabilization, moderate to

transient GAF scores, and information that indicate daily and work like activities which are inconsistent with marked mental limitations.[4]

### 1. The length of the treatment relationship and the frequency of examination and the nature and extent of the treatment relationship;

The ALJ reviewed these two considerations as to Plaintiff's treating physician's opinion's and Plaintiff's treatment. The ALJ reviewed the medical records and determined that the extent of the doctor's appointments included counseling, both drug and therapeutic, and medication management for Plaintiff's ADHD, depression, anxiety, and PTSD. R. at 21. The ALJ noted that there was "no evidence of inpatient care or emergency care for any mental symptoms." Id.; R. at 452-758; 807-867; 878-885.

### 2. Supportability and consistency of medical opinions

The ALJ recognized that the overall "treatment record are not consistent with the claimant's allegations concerning the severity of her mental impairments" and the medical opinions provided by her treating physicians. R. at 24 (emphasis added). The ALJ also reviewed the entirety of Plaintiff's medical records and determined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. at 21. The ALJ then recognized that Plaintiff has an impairment, which may impose certain limitations, but "are not indicative of any intractable condition that would preclude the claimant from perform a range unskilled work activity for 12 consecutive months." Id. Specifically, the ALJ referenced Plaintiff's Global Assessment Functioning scores (hereinafter "GAF") in support of this finding.

> A GAF score represents a clinician's judgment of an individual's overall level of functioning. Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000). A GAF score, by itself, is not dispositive of anything, and it "has no direct legal or medical correlation to the severity requirements of social security regulations." Powell v. Astrue, 927 F. Supp. 2d 267, 273

---

[4] The ALJ also discounted Dr. Baker's mental status examination, however, Plaintiff did not specifically challenge this. Accordingly, the undersigned does not address that determination.

(W.D.N.C. 2013). However, a GAF score can inform the ALJ's decision. See, e.g., Rios v. Comm'r of Soc. Sec., 444 Fed. App'x. 532, 535 (3d Cir. 2011) ("[GAF scores] are only medical evidence that informs the Commissioner's judgment of whether an individual is disabled.").

Kennedy v. Colvin, 2016 WL 890602, *3 (W.D.N.C. March 8, 2016).

From approximately June 15, 2012, to June 14, 2014, Plaintiff's score ranged from 55 to 75. These scores, as reasoned by the ALJ, represent moderate mental symptoms to transient mental symptoms. While alone non-dispositive, the ALJ did consider these scores as an objective determination and as part of the whole record.

The ALJ next noted improvement and stabilization of Plaintiff's symptoms reported in the record, which the ALJ believed to be inconsistent with the opinions. Specifically, the ALJ noted that Plaintiff "throughout the entire relevant time period, the claimant frequently reports to her treating sources that she is "doing well," "doing fine," or "doing very well." R. at 22; 455 ("she has been doing well"); 459 (despite having a bad day today, she has been doing well); (Aug. 4, 2010, Plaintiff doing very well); 473 (doing fine with medication); 476 (Nov. 3, 2010, Plaintiff stated she was doing well); 503 (June 22, 2011, Plaintiff reported doing well); 507 (July 20, 2011, doing well); 517 (Plaintiff reported being stable); 518 (Nov. 9, 2011, reported doing well); 632 (Sept. 25, 2014, doing well overall); 647 (January 16, 2015, reported doing fine and things are going well); 674 (July 1, 2015, doing well); 674 (ADHD symptoms fluctuate but are overall, stable).

The ALJ also noted that Plaintiff is deemed "stable" throughout her treatment and reported a "good" response to the medication regimen. R. at 462 ("'[I]t's a whole new life' being on Suboxone"); 500 (May 17, 2011, medication has made her more-timely); 681 (Oct 6, 2015, attention and focus stable with Ritalin); 622 (July 14, 2014, therapy and appointments with Dr. Haut have been very helpful); 642 (Oct. 2, 2014, "with review has actually shown some

improvement and progress with her use of the treatment strategies"); 674 (July 1, 2015, Ritalin and Zoloft "doing what they need to"); 681 (Oct 6, 2015, attention and focus are stable with Ritalin); 807 (April 9, 2015, reported doing better and able to give examples of how she uses the strategies to cope and manage her symptoms); 831 (Aug 4, 2016, Zoloft and Buspar continue to help her anxiety); 836 (Nov. 10, 2016, Ritalin continues to her stay focused); 855 (Sept. 1, 2017, Ritalin has helped with her inattention and hyperactivity); 856 (Sept. 23, 2017, symptoms of depression and anxiety have been well managed on Zoloft and inattention and hyperactivity remain controlled with Ritalin).

The ALJ next reviewed the medical opinions conclusion and Plaintiffs complaints that she rarely leaves home due to her condition, which the ALJ determined was inconsistent with the medical treatment notes. R. at 455 (remains out of work and looking for a new position, attended three meetings in past two weeks); 459 (May 5, 2010, looking at working with students as part of an employment program, attended two meetings in the last week); 464 (July 7, 2010, Plaintiff attended four meetings since last visit, Plaintiff has job interview with Valley Mental Health); 469 (attended seven to eight meetings in last month, decided not to look for another job but taking classes instead); 473 (attended "a few meetings" since last visit); 475 (attended 15 meetings in October, winterizing house, began walking three times a week for exercise, reported being "very active outside"); 478 (December 1, 2010, attended eleven meetings in past month, interested in taking classes, has been busy preparing for the holidays); 484 (February 2, 2011, has plans to certify to work with MRDD children in addition to her adult certification, also attended four meetings since last month); 490 (March 30, 2011, attended twelve meetings in the last month); 495 (attended fifteen minutes, began using a computer for email); 502 (June 22, 2011, attended thirteen meetings since last appointment, began exercising and reading to kids twice a week and

doing art with them); 505 (July 20, 2011, Plaintiff attending women's advocacy group twice, taking care of neighbor's farm for a week); 511 (Aug. 22, 2011, attended four meetings in the past month); 517 (Plaintiff reported wanting to go  back to work); 520 (Dec. 7, 2011, attended three recovery meetings); 522 ("readying to go back to work"); 525 (Feb 29, 2012, staying busy with 17 year old son and projects around the house);  526 (Feb. 29, 2012, reported that she is doing well and very busy, and began water coloring to relieve stress); 539 (June 15, 2012, Plaintiff works with two children as a respite worker); 542 (July 17, 2012, Plaintiff works babysitting kids, taking them to the pool, bowling, movies); 552 (Jan. 9, 2013, much more active and enjoying varied activities); 560 (April 17, 2013, reported that she babysits, and is considering taking an art class); 562 (May 30, 2013, participated in son's graduation celebrations, going to babysit over the summer); 617 (June 16, 2014, reported babysitting neighbors daughters and golfing); 622 (July 14, 2014, reported liking babysitting, going to movies and pool on regular basis); 674 (July 1, 2015, babying adolescents for neighbors, working on projects at home); 678 (Sept. 21, 2015, preparing house for winter months).

The ALJ thoroughly reviewed all of the factors that needed to be considered when failing to give a treating physician controlling weight. The ALJ provided a thorough review of the entire record and made a conclusion based on substantial evidence. Accordingly, the undersigned **RECOMMENDS** that the Plaintiff's Motion for Summary Judgment as to this issue be **DENIED**.

### ii.    Non-Medical Opinions or Opinions of Disability

Medical opinions "are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). "Opinions on some issues . . . are not medical opinions . . . but are,

instead, opinions on issues reserved to the Commissioner because they are administrative findings." For instance, the Commissioner is responsible "for making the determination or decision about whether [the claimant] meet[s] the statutory definition of disability. . . . A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will be determined that you are disabled." 20 C.F.R. § 404.1527(d)(1).

The ALJ discounted Ms. Thomas's February 19, 2015 letter in which Ms. Thomas documented her treatment of Plaintiff and her symptoms.[5] Id. at 444. The ALJ accorded Ms. Thomas's letter with little weight due to the "unhelpful nature" of the letter. Ms. Thomas's letter stated Plaintiff's diagnosis, symptoms, and treatment, however, was completely void of any information that would provide the ALJ with an understanding of Plaintiff's abilities, limitations, and mental restrictions. Id. at 444. This letter also provided no information that assisted in the determination of Plaintiff's RFC.

The ALJ noted that Dr. Berry's medical source statement was discounted because it stated that Plaintiff's is unable to "participate in the general workforce," due to her mental condition. This finding is specifically reserved for the Commissioner and Dr. Berry's personal opinion on the subject is irrelevant. What is relevant is Dr. Berry's opinion regarding Plaintiff's symptoms, diagnosis, prognosis, abilities, and limitations. 20 C.F.R. § 404.1527. Dr. Berry provided an overview of Plaintiff's treatment and diagnoses and symptoms but provided no opinion regarding Plaintiff's abilities or limitations. As seen above in the discussion of Ms. Thomas's letter, the ALJ cannot rely on a medical opinion regarding Plaintiff's abilities and limitations in the work force if the opinion does not provide that sort of information to the ALJ.

---

[5] Defendant argued that Ms. Thomas does not qualify as a treating medical source. The undersigned finds that this does not need to be determined.

Furthermore, in discounting both Ms. Thomas and Dr. Berry's letter, the ALJ thoroughly explained the issues with the letter and the reasoning that the letters were accorded little weight. R. at 25. Accordingly, the undersigned **RECOMMENDS** that Plaintiff's Motion as to this issue be **DENIED**.

2. **Substantial evidence supports the finding that she does not meet the criteria under the listings.**

At Step Three, a plaintiff has the burden of proof demonstrating that he or she meetings of the criteria for a Listing. 20 C.F.R. §§ 404.1525(c)(3). The ALJ examined Plaintiff under the following listings: 12.02 (neurocognitive disorders), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.11 (neurodevelopmental disorders), or 12.15 (trauma and stressor-related disorders). In order to satisfy the listings of 12.02, 12.04, 12.06, and 12.15, Plaintiff must satisfy either Paragraph B or C, as follows:

B.   Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):
1.   Understand, remember, or apply information (see 12.00E1).
2.   Interact with others (see 12.00E2).
3.   Concentrate, persist, or maintain pace (see 12.00E3).
4.   Adapt or manage oneself (see 12.00E4).

OR

C.   Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
1.   Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
2.   Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

i.   **Paragraph B**

The ALJ found that Plaintiff had moderate restrictions on Plaintiff's ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. The ALJ made this determination in consideration of Plaintiff's routine treatment, evidence of improvement and/or stabilization, mental status examination, Global Assessment of Functioning scores, and ability of Plaintiff to conduct daily activities and work activities. Plaintiff reiterated her argument, as demonstrated above, that there was substantial evidence satisfying Paragraph B as Dr. Haut authored two treating physician medical opinions stating that in his opinion Plaintiff meetings the listings of Paragraph B.

Plaintiff provided specific examples of what she believes demonstrated her extreme limitations. Plf. Br. at 11-12. Plaintiff, however, has not explained, beyond failure to give the treating physician's opinion controlling weight, as why the ALJ's determination is not supported by substantial evidence. Plaintiff argued that that she cannot do basic math so she has marked and extreme limitations; Plaintiff secludes herself from others and is uncomfortable in social interactions so she has marked limitation; Plaintiff is easily distractible so she has a marked limitation in her ability to concentrate, persist, or maintain pace; and an extreme limitation in ability to adapt and manage self because she needs assistance with bathing, taking daily medications, and shopping. Simply providing examples of what Plaintiff deemed to constitute marked and extreme limitations is insufficient to establish that the ALJ's decision was not based on substantial evidence. Plaintiff argued that the ALJ erroneous substituted his own judgment for that of the doctor by cherry-picking facts that support his decision but argued that remand is required by cherry-picking facts in favor of the Plaintiff.

Furthermore, Plaintiff provides no legal support in favor of remand in which a reviewing court remanded a case simply because there is evidence supporting the contrary decision. "A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion." Probst v. Berryhill, 377 F. Supp. 3d 578 (E.D.N.C. March 22, 2019); see also, Johnson v. Barnhart, 434 F.3d 650 (4th Cir. 2005) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls of the [ALJ]."). Accordingly, the undersigned **FINDS** that the ALJ did not err by finding that Plaintiff does not meet the listings under Paragraph B. Furthermore, the undersigned **FINDS** that because the listing of 12.11 requires Paragraph A and B, this determination was made based on substantial evidence.

### ii. Paragraph C

The ALJ next determined that "the evidence fails to establish the presence of the 'paragraph C' criteria" and there is "no documentation in this record that the claimant meets such further requirements" as to the remaining listings. R. at 19.  Plaintiff argued that Plaintiff meets the listing because she has been under the treatment of Dr. Haut for approximately four years and lives in a highly structured setting with Dr. Baker *and* she had a minimal capacity to adapt to changes in her environment. Plaintiff pointed to the ALJ's hypothetical to the vocational officer in which he determined Plaintiff could have "no fast-paced production requirements and few workplace changes." R. at 96. Defendant then argued that the ALJ was only required to provide a hypothetical that was supported by the record.

The undersigned, however, is unable to determine what the ALJ considered when reaching this determination. Radford v. Colvin, 734 F.3d 288, 295-95 (4th Cir. 2013). While the other portions of this opinion provide ample explanation, this paragraph simply explains what is

required to show in Paragraph C and stated that "there is no documentation in this record that the claimant meets such further requirements." The undersigned finds that there is ample evidence in the record that demonstrates that has been seeking treatment for a period of at least two years and there is evidence of both ongoing medical treatment and therapy and evidence that may provide support that Plaintiff is unable to adapt in her environment. At the very least, these requirements should be reviewed and discounted by the ALJ. Accordingly, the undersigned **RECOMMENDS** remand on this issue to fully review and explain the reasoning of the Paragraph C criteria. Radford, 734 F.3d 288 (4th Cir. 2013) (citing Florida Power & Light Co. v. Lorion, 470 U.S. 729 (1985)).

### 3.  The ALJ presented an accurate hypothetical to the vocational officer.

"Upon formulating a claimant's RFC, the ALJ must determine whether a significant number of jobs exist in the national economy that have requirements which the claimant is able to meet despite his or her RFC." Gorayeb v. Astrue, 845 F. Supp. 2d 753 (N.D.W. Va. 2011). To do this, the ALJ relies on a vocation officer to determine whether there are jobs available and will respond to the ALJ's hypothetical question regarding Plaintiff's ability to complete past relevant work or other suitable work in the national economy. Id. at 760. "In order for a vocational expert's opinion to be relevant or helpful, it must be based upon consideration of all other evidence in the record." Johnson v. Barnhart, 434 F.3d 650 (4th Cir. 2005) (quoting Walker v. Bowen, 889 F.2d 47, 50 (4th Cir. 1989)). The ALJ, however, "has 'great latitude in posing questions and is free to accept or reject suggested restrictions so long as there is substantial evidence to support the ultimate question.'" Gorayeb, 845 F. Supp. 2d at 761.

The ALJ posed the following hypothetical:

Assume a hypothetical individual of the same age, education, and work experience as the Claimant, who retains the capacity to perform medium work; must avoid all exposure to unprotected heights, hazardous machinery and commercial driving; whose work is limited to simple and routine and repetitive tasks; requiring only

> simple decisions; with no fast-paced production requirements and few workplace changes; who is to have no interaction with the public and only occasional interaction with coworkers and supervisors.

R. at. 96.

Plaintiff provides three challenges to the hypothetical presented to the vocational officer at the May 17, 2018 hearing. First, Plaintiff argued that Plaintiff is unable to retain the ability to perform medium work. Plaintiff argued that the ALJ incorrectly concluded that Plaintiff retained the ability to perform medium work because the ALJ previously noted that Plaintiff was unable to perform her previous work which was deemed light to medium work. Second, Plaintiff argued that she cannot perform any production requirements because it takes Plaintiff all day to conduct simple tasks. Plaintiff cited to the record that supported this statement, specifically pointing to the statement in Plaintiff's disability determination that was provided by her attorneys and the medical statement source that was previously discounted and accorded little weight. Third, Plaintiff argued that that she is unable to have any interaction with coworkers or supervisors because Dr. Haut's medical source statement explained that Plaintiff isolated herself after approximately five minutes sitting near people and leaves conversations due to her impairments. Plf. Br. at 15.

The undersigned had previously reviewed the ALJ's discounting of this medical source statement based on the substantial evidence provided by the record. The undersigned determined that according less weight to the treating physicians was appropriate. Furthermore, the determination of Plaintiff's RFC was based on substantial evidence and thoroughly reviewed by the ALJ. The ALJ based this determination on her daily activities, the State agency consultations, and Plaintiff's treatment records. Accordingly, the undersigned **FINDS** that Plaintiff's argument that the hypothetical that the ALJ posed was incorrect is unfounded and the ALJ appropriately

constructed a hypothetical based on substantial evidence in the record and **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **DENIED** as to this issue.

### 4.   RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that

Plaintiff's Motion for Summary Judgment (ECF No. 18) be **GRANTED IN PART** and **DENIED IN PART**, Defendant's Motion for Summary Judgment (ECF No. 16) be **DENIED IN PART** and **GRANTED IN PART** and the decision of the Commissioner be vacated and this case be **REMANDED** pursuant to for further proceedings.

Any party shall have fourteen days from the date of filing this Report and Recommendation within which to file with the Clerk of this Court, **specific written objections, identifying the portions of the Report and Recommendation to which objection is made, and the basis of such objection.** A copy of such objections should also be submitted to the United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk of the Court is **DIRECTED** to provide a Copy of this Report and Recommendation of counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this January 27, 2020

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE